**SOUTHERN NATURAL GAS COMPANY**

v.

**The UNITED STATES.**

**No. 479–58.**

United States Court of Claims.
June 20, 1969.

---

John P. Lipscomb, Washington, D. C., attorney of record, for plaintiff. C. Rudolf Peterson, George W. Beatty, and Michael Mulroney, Washington, D. C., of counsel.

Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty. Gen., Johnnie M. Walters, for defendant. Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The Commissioner has done so in an opinion and report filed on January 23, 1969. A notice of intention to except was filed by both plaintiff and defendant. On April 25, 1969, plaintiff and defendant each filed a motion for leave to withdraw its notice of intention to take exception to the report and each moved that the court adopt the trial commissioner's report as the basis for its judgment in this case. With slight modifications, the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, and hereby grants the parties' motions for leave to withdraw the notices of intention to except and adopts the commissioner's opinion, findings and recommended conclusion of law as the basis for its judgment in this case without oral argument.

In adopting the commissioner's opinion, as modified, we emphasize the trial commissioner's statement that, under the facts of this case, it is unnecessary to decide whether the taxpayer's right-of-way easements constitute intangible property, because the use of the double declining method of depreciation is not in issue. We adhere to our holding in Panhandle Eastern Pipe Line Co. v. United States, 408 F.2d 690, 187 Ct.Cl. 129, decided March 14, 1969. Therefore, nothing contained in the trial commissioner's opinion should be interpreted as a modification of that decision, or as a holding by the court that the right-of-way easements involved in this case are tangible assets for income tax purposes.

Therefore, plaintiff is entitled to recover, to the extent indicated in the opinion, on (1) the issue involving the depreciability of costs of surveys and of acquiring, clearing, and grading the transmission line rights-of-way; (2) the issue involving the acquisition of property with bonds issued at below par (to the limited extent indicated); (3) the excess profits tax issue involving the allocation of amortization on emergency facilities to its natural gas property; (4) the issue involving the depreciation basis of property purchased with preferred stock; (5) the issue involving the Alabama Natural Gas Corporation note; (6) the pooling expense issue; (7) the capitalization of depreciation issue (to the limited extent indicated); and (8) the issue concerning the loss on the sale of the compressor, together with interest as provided by law. Judgment is entered for plaintiff accordingly with the amount of recovery to be determined pursuant to Rule 47(c). Plaintiff is not entitled to recover on the interest during construction issue, and with respect to this aspect of the case, as well as all the other claims which are set forth in the petition but which were not thereafter submitted to the court for adjudication and are not, therefore, hereinabove enumerated, the petition is dismissed.

Commissioner Gamer's opinion, as modified by the court, is as follows:

As part of its business as an interstate natural gas company, plaintiff, after purchasing and producing such gas, transports it by an underground pipeline system. Its petition herein seeks recovery of approximately $1,880,000 representing claimed overpayments of its income taxes for the calendar years 1941–1953, and its excess profits taxes for 1941 and 1943. The claim is composed of several separate items, which, for convenience, will here be considered in the same order as presented by the parties in their briefs.

The original transmission system was constructed in 1929 and 1930 by plaintiff's predecessor, the Southern Natural Gas Corporation. Plaintiff acquired the predecessor's assets in 1935. "Plaintiff" will be used herein as referring to either the predecessor or the plaintiff where distinction is not essential to the matter being discussed.

## DEPRECIABILITY OF COSTS OF SURVEYS AND OF ACQUIRING, CLEARING, AND GRADING THE TRANSMISSION LINE RIGHTS-OF-WAY

At the end of 1941, plaintiff's transmission line system consisted of 1,339 miles of pipe. By the end of 1953, it had expanded to 3,795 miles of pipe. Plaintiff also has gathering lines originating in its producing gas fields. These lines convey the gas to its trunk transmission lines.

To construct such transmission line system, plaintiff obtained right-of-way or easement grants from the owners of the properties in which the pipes were laid. Certain costs were necessarily incurred in acquiring such right-of-way agreements. These costs included the amounts paid to the landowners, salaries and expenses of plaintiff's employees (landmen) engaged in such acquisition activity, recording and legal fees, and expenditures to obtain highway, railroad, and river-crossing permits from the necessary authorities. Substantial costs were incurred in clearing and grading the rights-of-way. Costs were also incurred in connection with surveying the rights-of-way, as well as in making surveys relating to actual line construction. It is the depreciability of these costs of acquiring, clearing, and grading the transmission line rights-of-way, as well as of said surveying costs, which is at issue in this item.

One of the first steps taken in connection with the construction of a proposed line is the assembling by plaintiff's engineering department of all available pertinent maps and the plotting thereon of the route of the line. These route maps are used in connection with obtaining from the Federal Power Commission (hereinafter referred to as the "FPC") a certificate of public convenience and

necessity.[1] If time permits, aerial photographs of the area to be traversed are also taken and used for such purpose.

After a definite decision to build the line has been made and FPC approval obtained, plaintiff, prior to the commencement of actual construction, (1) commences the task of obtaining the necessary rights-of-way, and (2) arranges for the proposed line to be surveyed.

The acquisition of the rights-of-way is handled by plaintiff's land department which begins by using the route maps and, where taken, the aerial photographs. After property ownership is determined, permission is obtained for plaintiff to make a field or land survey.

The survey is normally made in two forms (a) aerial, and (b) field or land. The aerial phase precedes the land and permits the preparation of an initial composite map, as well as the compilation of aerial mosaics (composite maps made from a group of aerial photographs). Plaintiff's engineering department then places all the available construction details on the mosaics, which are furnished to the construction contractor. Such information as where to install casing under railroad and highway crossings and the diameter and thickness of the pipe to be installed at various locations, is indicated. The field or ground survey is made to mark, by means of stakes, the route of the line. The exact location of intervening fences and roads is established. The ground survey data is also placed on the aerial mosaics.

The initial composite map and the aerial mosaics also go to plaintiff's land department for its use in acquiring the necessary right-of-way agreements. The department, however, does not wait for the final maps before commencing the acquisition of the rights-of-way. Where right-of-way agreements cannot be obtained, plat surveys are also made for condemnation purposes.[2]

The consideration paid to the landowners for the right-of-way agreements is generally in the form of a fee per lineal rod. It is, therefore, referred to as a "roddage" fee. Occasionally, however, a flat amount not based on roddage is paid. In addition to right-of-way agreements, plaintiff must obtain the necessary highway, railroad, and river-crossing permits.

The first actual construction operation is the clearing of a sufficient width on the right-of-way to permit the construction crews to operate. This operation, an expensive one, includes the removal of fences, growing crops, brush, timber, and rocks.

Following the clearing, the right-of-way is then graded to prepare it for the succeeding construction operations. In certain areas grading may be necessary to accommodate the bending tolerance of the pipe. Stream banks may be graded down, and riprapping may be required in marshy areas. Grading is likewise an expensive operation.

In its returns for each of the years in issue, plaintiff included as part of its depreciation base amounts representing the costs[3] of obtaining the right-of-way agreements for plaintiff's transmission pipelines, as well as the above-mentioned surveying, clearing, and grading costs. Plaintiff considered such costs as properly includable in the cost of constructing its tranmission system, and therefore depreciable on the same basis as such system.[4] However, by a notice of

1. This was a requirement only after June 21, 1938. 15 U.S.C. § 717f (1964).

2. Plaintiff obtained the power of eminent domain under the Act of July 25, 1947, ch. 333, 61 Stat. 459. Under the Act, plaintiff has the right to lay a single pipeline through an owner's land.

3. Or, after 1943, its predecessor's tax basis concerning such items.

4. Section 23 of the Internal Revenue Code of 1939 (26 U.S.C. § 23 (1952)) provided that:
 "§ 23. Deductions from gross income.
 "In computing net income there shall be allowed as deductions:
 \* \* \* \* \* \* \*
 "(*l*) Depreciation.
 "A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

deficiency dated February 26, 1958, the Commissioner of Internal Revenue excluded such amounts from plaintiff's depreciation base and disallowed the deductions for depreciation thereon. The amounts so excluded by the Commissioner (after his making certain adjustments in the claimed costs (or other tax basis), which adjustments are not here in issue) totaled, for all the years involved, $10,963,125.80 for the right-of-way acquisition costs, and $28,074,838.11 for the surveying, clearing, and grading costs. Of the latter figure, 21 percent, or $5,895,716, represents surveying costs, and the balance of $22,179,122.11 represents clearing and grading costs.

Plaintiff contends that the costs in dispute are an integral part of its investment in the transmission pipelines and should, therefore, properly be depreciated as a part of such pipelines and over their lives. It alternatively says that if such costs are not considered as a part of such investment and, therefore, must stand independently, their useful lives are, nevertheless, so closely related to those of the lines that they are properly measurable by the lives of such lines, thereby producing the same result.

Defendant argues, however, that the useful lives of the rights-of-way were, during the years in question, indeterminate and therefore not properly to be considered either as an integral part of, or as closely related to, the pipelines themselves, which concededly have limited lives of reasonable estimation and are, therefore, properly depreciable. While it is not disputed that intangibles (which defendant contends the rights-of-way constitute) may, where their useful lives have value for a reasonably estimable limited period, also be subject to a depreciation allowance,[5] defendant contends that, in this instance, the intangible rights-of-way, being indeterminate during the years involved, did not have such a reasonably estimable useful life. It points out that the right-of-way agreements themselves are not limited in time and specifically permit entrance upon the land for pipeline maintenance and replacement purposes. Defendant maintains that plaintiff consequently has the potentially perpetual right of pipeline removal and replacement. And it further shows that normally, by their terms, the rights-of-way give plaintiff the right to lay additional pipelines thereon (i. e., "multiline" agreements). Plaintiff has in fact laid additional lines on the rights-of-way for the purpose of increasing the capacity of the system, such lines laid adjacent or parallel to the original lines being called "loop" lines. As a consequence, defendant claims, plaintiff errs when it contends that the rights-of-way should be considered an integral part of the costs of the construction of the original pipeline only, or of the line in connection with which they were first procured, with their lives, therefore, to

"(1) of property used in the trade or business, or

"(2) of property held for the production of income."

5. Treas.Reg. 103, § 19.23(*l*)–3 (1939 Code); Treas.Reg. 111, § 29.23(*l*)–3 (1939 Code). These regulations read as follows:

"Sec. 29.23(*l*)–3. *Depreciation of Intangible Property.*—Intangibles, the use of which in the trade or business or in the production of income is definitely limited in duration, may be the subject of a depreciation allowance. Examples are patents and copyrights, licenses, and franchises. Intangibles, the use of which in the business or trade or in the production of income is *not* so limited, will not usu-

ally be a proper subject of such an allowance. If, however, an intangible asset acquired through capital outlay is known from experience to be of value in the business or in the production of income for only a limited period, the length of which can be estimated from experience with reasonable certainty, such intangible asset may be the subject of a depreciation allowance, provided the facts are fully shown in the return or prior thereto to the satisfaction of the Commissioner. No deduction for depreciation, including obsolescence, is allowable in respect of good will."

Defendant does not, for instance, dispute plaintiff's depreciating, as part of the pipeline costs, the item of damages arising from the construction activity which plaintiff paid to compensate the landowners.

be considered as coterminous therewith. Consequently, argues defendant, the case properly falls within the rule established by the pertinent regulations [6] and the cases [7] that where the use of intangibles in the particular trade or business or in the production of income is not shown to be limited in duration, or where such limitation is shown to exist but the extent thereof is nevertheless not demonstrated with reasonable certainty or accuracy, then the intangibles are not subject to a depreciation allowance.[8]

The surveying, clearing, and grading costs herein involved, defendant says, are costs wholly related to the rights-of-way and, for the same reasons, must also be considered as indeterminate and therefore nondepreciable.

 While, as was said by the court in a similar situation where defendant made much the same contentions, "[t]here is force to each [such] argument" (Shell Pipe Line Corporation v. United States, 267 F.Supp. 1014, 1019 (S.D.Tex.1967)), nevertheless, based on the record herein, including the ample, credible, and unrebutted testimony offered by plaintiff, it is concluded that plaintiff has here carried its burden of showing that the right-of-way acquisition costs, as well as the surveying, clearing, and grading costs in question, will have no substantial usefulness after the expiration of the concededly limited life of the individual pipeline to which they are related. It thus becomes unnecessary to decide (1) whether, as plaintiff primarily contends, such costs, even though originally intangible in nature, became merged into the overall physical project and, therefore, are to be considered as part of the depreciable costs thereof,[9] or (2) whether, as plaintiff alternatively contends, the costs, even though they are treated independently as intangibles, are, because of their direct interrelationship with the particular pipeline for which they were acquired, nevertheless to be considered as having useful lives only coextensive with that of the pipelines.[10] Under either theory the result here would be the same, *i. e.*, plaintiff is entitled to depreciate the costs in dispute at the same rate as has been established and applied for the related pipeline (as to which there is here no dispute).[11]

6. See n. 5.

7. Westinghouse Broadcasting Co. v. Commissioner of Internal Revenue, 309 F.2d 279 (3d Cir. 1962), cert. denied 372 U.S. 935, 83 S.Ct. 881, 9 L.Ed.2d 766 (1963).

8. In 1965 the Internal Revenue Service issued Rev.Rul. 65–264, 1965–2 Cum.Bull. 53, providing that where oil and gas pipeline right-of-way costs (which may include costs of surveying, clearing, and grading the rights-of-way, as well as such items as legal fees, salaries of right-of-way agents, roddage fees or other consideration to landowners, and severance and crop damage) will no longer be useful after the expiration of the useful life of a related pipeline, they may be depreciated over the life of the related pipeline. To qualify for such depreciation, however, the taxpayer must prove that such costs will not be useful in the construction of additional pipelines, including both loop lines and replacements in the original trench.

A companion ruling, Rev.Rul. 65–265, 1965–2 Cum.Bull. 52, held such costs attributable to buildings and roadways to be part of the total cost of the project.

9. As the court held, for instance, in Connecticut Light and Power Company v. United States, 368 F.2d 233, 241, 244, 177 Ct.Cl. 395, 409, 415 (1966), in which it treated the flowage rights and easement costs there involved "as much a part of the cost of the [dam and hydroelectric plant] project as labor and material used in the construction" thereof, "inseparably linked with the overall costs of the project," and therefore required to "be considered as part of such depreciable costs."

10. As the court treated the petroleum pipeline rights-of-way in Badger Pipe Line Company v. United States, 401 F.2d 799, 185 Ct.Cl. 547 (1968), and Texas-New Mexico Pipe Line Co. et al. v. United States, 401 F.2d 796, 185 Ct.Cl. 570 (1968), as having, because they "are directly and completely interrelated to the particular pipelines for which they were acquired" (*Badger Pipe Line Company, supra*, 185 Ct.Cl. at 569), useful lives coextensive with that of such pipelines.

11. The distinction would become important were the use of the double-declining balance method of depreciation involved since, under section 167(b) of the 1954 Code,

■ It has long been recognized that expenditures so intimately related to, and connected with, the acquisition of a capital asset are to be treated as part of the cost of or investment in the asset. Columbia Theatre Co., 3 B.T.A. 622 (1926); Louisiana Land & Exploration Co., 7 T.C. 507 (1946), affirmed, 161 F.2d 842 (5th Cir. 1947); Herbert Shainberg, 33 T.C. 241 (1959).[12]

Although it is true, as defendant emphasizes, that the rights-of-way herein involved are in form indeterminate, plaintiff has shown that, in fact and in actual practice, when another adjacent or loop line is laid, additional right-of-way costs are again incurred with respect to such new line, even though it is on the same right-of-way. Thus an individual and substantial set of right-of-way costs is incurred with respect to each line constructed, with the new line receiving, on a total length basis, only insignificant benefit from the prior right-of-way expenditures.

In the construction of its loop lines, plaintiff has, considering the length of such lines and the differences in terrain they traverse, naturally encountered a variety of situations concerning its right-of-way agreements.

Practically all of the rights-of-way plaintiff procured in 1929 and 1930 for the original transmission system were multiline agreements but specified no right-of-way width. A few (less than four percent of the total) specified 30

feet. On plaintiff's first looping operation undertaken in 1939, plaintiff found it legally advisable to obtain from the landowners additional agreements which provided that the previously procured right-of-way was 30 feet in width and which granted plaintiff an additional 40 feet.

■ Whenever the existing right-of-way specifies a width insufficient to permit the laying of a loop line, plaintiff is, of course, required to obtain an additional right-of-way. Similarly, if the width is sufficient for a second line, but contains insufficient working space, plaintiff must again obtain additional width. Title and other expenses are thus incurred. Furthermore, even when the originally procured easement (if multiline) is sufficiently wide to hold the additional line, as well as to provide working space, plaintiff still, in accordance with the provisions of the right-of-way instrument, pays the owner new roddage fees (normally $1.00 per lineal rod for each additional pipeline laid) and obtains from the landowners additional line receipts, which are recorded, acknowledging the existing right-of-way. Thus plaintiff has found that, while right-of-way costs constitute on an overall basis only a small percentage of the costs of constructing a pipeline, the costs relating to rights-of-way which are incurred in connection with building loop lines are, nevertheless, substantial when considered as an individual item. Indeed,

intangibles are not subject to such depreciation method. See Panhandle Eastern Pipe Line Co. v. United States, 408 F.2d 690, 187 Ct.Cl. 129, decided March 14, 1969.

12. Rev.Rul. 65–265, 1965–2 Cum.Bull. 52, provides:

"The grading of land involves moving soil for the purpose of changing the ground surface. It produces a more level surface and generally provides an improvement which adds value to the land. Such expenditures are 'inextricably associated with the land' and, therefore, fall within the rule that land is a nondepreciable asset. See Algernon Blair, Inc., v. Commissioner of Internal Revenue, 29 T.C. 1205 (1958), C.B. 1952–2, 4.

"However, excavating, grading and removal costs directly associated with the construction of buildings and the paved roadways, are not 'inextricably associated with the land' itself. These costs, since they have a direct association with such construction, are part of the costs of construction of the buildings and the paved roadways.

" * * * The costs attributable to excavation, grading and removing soil necessary for the proper setting of the buildings and paving of the roadways are part of the cost of those assets and should be included in the depreciable base for the buildings and roadways."

the record indicates they have greatly exceeded the right-of-way acquisition costs incurred in the building of the original line. While the increase no doubt also reflects cost increases over the years, it is plain that new substantial right-of-way costs are incurred whenever plaintiff builds a loop line. Furthermore, the highway, railroad, and river-crossing permits which plaintiff obtains authorize the construction of only one line. Additional permits must, therefore, be obtained whenever another line is constructed. Thus there appears to be lacking any practical reason which would preclude the segregation and allocation of the original right-of-way costs to the original line, and the subsequent right-of-way costs to the loop line, an allocation which, according to this record, appears to truly reflect the substantial accuracy of the situation. Under familiar principles, this practical approach to the depreciation problem is all that is required since, in such cases, mathematical certainty is not a prerequisite. Badger Pipe Line Company v. United States, 401 F.2d 799, 185 Ct.Cl. 547 (1968).

As to the survey costs, the record shows, as above indicated, that after an FPC certificate of public convenience and necessity is obtained, the new line and its right-of-way have to be surveyed and staked. For one thing, it is imperative that a proper distance be kept from the old line. Changes since the last survey in stream, highway, railroad, prevalent crop, and structure conditions, must all be considered. And surveys must be made to locate new road, railroad, and river crossings, as well as to obtain the necessary permits.

Similarly, substantial clearing and grading costs are also incurred in connection with the building of a second line. It is true that, although the original clearing and grading operations are not conducted in a manner which considers a possible future looping operation, some benefit is nevertheless naturally obtained from the previous right-of-way clearing operation. However, this is usually offset by the detriment of the prior grading. All of the previous grading work originally done on the area that becomes the working side of the new line must be destroyed. Such topographical features as drainage controls and terracing built after the original construction must be first torn out and then restored. Any usefulness the clearing and grading costs would have beyond the life of the pipeline in connection with which they are incurred would, as of the time of such incurrence, be speculative. The operations are not, as stated, conducted with an eye toward the placing of another line on the right-of-way in the future.

Plaintiff's experience has shown that surveying, clearing, and grading costs incurred in connection with the construction of loop lines have been substantial. While the record shows that surveying costs incurred incident to such construction have been, although substantial as an item, less in dollar amount than those incurred on the original lines, clearing and grading costs have for the most part been substantially more than the counterpart costs on the original line.

One of the tests that has been applied by the Revenue Service to ascertain if an expenditure is properly part of a particular depreciable asset is to determine whether the same type of cost will recur with each reconstruction of the asset. If it would so recur, the original expenditure may reasonably be considered to constitute, for depreciation purposes, a part of the cost of the original construction, and each recurring cost of a similar nature may be considered to be a part of the subsequent reconstruction in connection with which it was incurred. One such example appears in G.C.M. 9357, X–1 Cum.Bull. 385 (1931), where various undistributed construction expenditures incurred by a public utility were, for depreciation purposes, held to constitute a part of the cost of the property since the nature of the expenditures (which included engineering and office salaries and expenses, legal expenditures, damages, and insurance) was such that they would recur with each reconstruc-

tion of the property. On this record, the right-of-way, surveying, clearing, and grading expenditures herein involved meet this test.

It would be physically possible for plaintiff to lift an old pipeline out of the ground and replace it with new pipe (provided the line can be taken out of service). However, plaintiff has shown that the economics of its industry are such that, except in congested areas, it is more economical to lay a new adjacent or parallel line and abandon the old line in place, and that there is no reason to consider plaintiff's lines differently from those of the remainder of the industry.[13] The lifting costs themselves would be considerable. Nor is there any substantial continuing market for large quantities of old pipe except as junk, so that this factor of possible monetary recoupment is of little or no consequence. For safety reasons, old pipe cannot be reused in the gas industry without extensive testing. Nor is it suited for use in modern high pressure pipelines. Right-of-way costs are, on an overall basis, normally one of the smallest items of cost in the construction of a pipeline and therefore hardly a determinative factor. Cf. Shell Pipe Line Corporation v. United States, supra, 267 F.Supp. at 1018. Actually, however, plaintiff has, except for three instances, made no substantial replacements of its lines. It is true that in these instances plaintiff did, because the lines were in highly congested areas, lift the old pipe and replace it with new pipe in the same right-of-way without incurring any additional roddage fees or right-of-way costs. Two instances were in the Atlanta, Georgia, area, involving six and five miles respectively, and the third was in the Birmingham, Alabama, area, involving eight miles. In these three congested area instances, the cost of obtaining new rights-of-way, the time that would necessarily be involved in acquiring them, and the lack of required space in which to

lay a parallel line, made the lifting and replacement operations in the same trench a practical and economic necessity. But these were exceptional circumstances in atypical areas. Some nineteen miles of line in congested areas out of a total of close to 3,800 running through Louisiana, Mississippi, Alabama, and Georgia can hardly be the basis for a conclusion that plaintiff would, contrary to its general industry practice based upon the aforesaid considerations, generally replace an old line by lifting it in order to reuse the old trench. On the Birmingham replacement, plaintiff's cost of lifting and replacing the pipe on the old right-of-way (which, because of the congested area, included heavy construction damages) was more than twice what the cost of laying a new line would have been had the right-of-way not been located in a residential area.

Finally, defendant points out that plaintiff's rights-of-way give plaintiff the right to use the property covered thereby to transport by pipeline "any substance or commodity," and that the easements, being assignable, could be sold to others for any such use. Accordingly, it argues that the rights-of-way have separate, independent value which may well outlive the pipelines now being used only for the transportation of natural gas. Defendant says that pipelines can be, and are being, used to transport such varied products as coal, oil, sludge, oxygen, alcohol, and brine. It therefore contends: "This multiple use feature of taxpayer's right-of-way agreements coupled with their indefinite duration and assignability brings them very close to fee interests, especially in the light of advancing pipeline technology and land values" (Def. Brief at 40). On these considerations, it concludes that the lives of the rights-of-way should not be related and limited to the lives of the pipelines. Thus, the writeoff of the right-of-way investments should, it con-

13. Under Treas.Reg. 1.167(a)–1(b), promulgated under the 1954 Code, if the taxpayer's own experience is inadequate, the general experience in his industry may be used to determine estimated useful life for depreciation purposes.

tends, be permitted only when their abandonment occurs, which would coincide with the abandonment of the use of the pipeline for the transportation of natural gas, as at present, or for any of the other possible purposes. At the present time defendant says neither plaintiff nor its relatively new industry has established any reasonable basis by experience or otherwise for a reasonably accurate forecast as to when such abandonment will occur.

■■ The theoretically possible uses of plaintiff's rights-of-way for businesses other than plaintiff's current one are so speculative that defendant's contention based thereon must be rejected. Almost anything involving future applicability is, of course, possible, or at least technically conceivable, but depreciation allowances are based on estimates grounded upon reasonable probabilities and practical business considerations. Speculation on similarly remote possibilities of easement uses disassociated from current plant use was rejected in considering easement depreciation problems in Connecticut Light and Power Company v. United States, 368 F.2d 233, 177 Ct.Cl. 395 (1966),[14] as well as in Union Electric Co. v. Commissioner of Internal Rev., 177 F.2d 269 (8th Cir. 1949)[15] (amounts paid for land rights, flowage rights, and easements for transmission lines, all acquired in connection with dam and hydroelectric plant, are depreciable as incident to the project itself).

During the years in question plaintiff had no plans to enter into any other business, nor would it have been eco- nomically advisable or practical for it to have converted its lines to the carrying of substances other than natural gas. At no time has plaintiff contemplated any such conversion. Thus, its rights-of-way, despite their indeterminate lives, would reasonably have no value during such years except in connection with plaintiff's physical transmission system which defendant concedes has only a limited life. Accordingly, industry right-of-way abandonment or retirement experience is beside the point. In neither *Union Electric, supra* (depreciation of dam based upon estimated useful life of one hundred years), nor *Connecticut Light and Power Company, supra* (hydroelectric properties considered to have life of from fifty to sixty years), was lack of industry meaningful experience in retirement of the easements, rights, and privileges involved an obstacle to allowing depreciation thereon on the same basis as the physical plant. Also see Kentucky Utilities Company v. Glenn, 250 F.Supp. 265 (W.D.Ky.1965) (amounts paid for flowage and flooding rights in connection with dam and hydroelectric project may be depreciated on same basis as estimated life of dam and electric plant, i. e., one hundred years).

There is nothing in the record to indicate that plaintiff's rights-of-way have, by themselves, any value separate and independent from the lines for which they were procured. On the other hand, the record does show that when plaintiff acquired some forty miles of rights-of-way for a proposed line, which, it turned out, was never built, the rights-of-way were abandoned as useless.

14. The fact that "because the rights acquired *might* be used in connection with another hydroelectric project which *might* be constructed after the Shepaug project becomes useless," did not serve to sustain "defendant's contention that the expenditures are not depreciable * * *." (368 F.2d at 243, 177 Ct.Cl. at 413.

15. "But the Commissioner argues that in the event another dam should be constructed at the same place in the Osage river after the present dam has become useless these rights here involved would not be exhausted and they would never require replacement. In such case the taxpayer would not have to pay anew for highways submerged, for buildings razed nor for moving bodies from cemeteries. In this the Commissioner does not take into account the principle that the right to deductions for depreciation does not depend upon mere possibilities." (177 F.2d at 275.) The Revenue Service has refused to follow this case. Rev.Rul. 55–729, 1955–2 Cum.Bull. 53.

While issues involving the depreciation of capital assets frequently turn upon the facts of the individual case,[16] nevertheless no case has been cited denying the depreciability of transmission pipeline rights-of-way. On the other hand, in the above-mentioned similar cases of Badger Pipe Line Company v. United States and Texas-New Mexico Pipe Line Company v. United States, *supra*, involving the depreciability of rights-of-way acquired in connection with the construction of petroleum transmission lines, this court recently, on grounds similar to those here relied upon, sustained such depreciability, holding that the useful lives of the related easements were coterminous with that of the pipe. The same result was also arrived at in Portland General Electric Company v. United States, 189 F.Supp. 290, 305 (D.Ore.1960), affirmed on other issues, 310 F.2d 877 (9th Cir. 1962) (depreciation allowed on the costs of acquiring and clearing rights-of-way for electrict transmission lines); *Union Electric Co., supra* (depreciation allowed on easements for electric transmission lines), and *Shell Pipe Line Corporation, supra* (depreciation allowed on costs of easements for petroleum transmission pipelines).

Based on all the above considerations, the conclusion is compelled that plaintiff is entitled to depreciate the right-of-way acquisition costs in dispute at the same rate as has been established and applied for the related transmission pipeline systems.[17]

Defendant contends that all the survey costs were of benefit in the acquisition of the rights-of-way since the aerial and field survey information is ultimately furnished to plaintiff's land department to aid it in acquiring the rights-of-way and the highway, railroad, and river-crossing permits, as well as to serve as an aid in any necessary condemnation proceedings. It therefore urges that all such costs should be treated in the same manner as the right-of-way acquisition costs, which, as shown, it contends were, during the years in question, nondepreciable. Plaintiff disputes this, claiming that a substantial part of the survey costs should be allocated to the construction of the pipeline itself because of the part the surveys play in providing the construction contractor with the necessary construction details. It emphasizes the fact that the land department does not wait for the final survey maps before commencing the acquisition of the rights-of-way.

◼ However, this issue too need not be decided because, even if defendant is correct and all the survey costs are allocated to the rights-of-way, they would, in accordance with the above analysis, be depreciable anyway. And if plaintiff is right, the part of the survey costs allocated to detailing the necessary construction data would also be depreciable. Certainly such part of the survey costs would have to be considered as a necessary and integral part of the total construction cost, as defendant impliedly concedes when it attempts to throw the entire survey costs into the right-of-way category. Therefore, under either theory, the survey costs are depreciable on the same basis as the transmission system itself.

◼ The costs of clearing and grading the rights-of-way are also similarly depreciable whether they be considered as properly allocable only to the right-of-way costs or as an integral part of the overall line construction costs.[18] As shown, their usefulness extends in no substantial manner beyond the life of the pipeline to which they were originally related. Clearing and grading of the rights-of-way are two essential elements in the laying of a pipeline.[19] As the

---

16. 4 Mertens, Law of Federal Income Taxation, § 23.01, at 7–8 (1966 Rev.).

17. Plaintiff employs a composite straight-line method of computing depreciation for federal income tax purposes. Under this method, the depreciable properties, such as its transmission pipeline systems, are included in one account with an overall composite rate of 4 percent.

18. See Rev.Rul. 65–265, referred to in n. 8.

19. Included in the capitalized costs of plaintiff's gathering lines are its costs of sur-

court held in Commonwealth Natural Gas Corp. v. United States, 395 F.2d 493, 494 (4th Cir. 1968): " * * * the costs of clearing and grading are attributable to the cost of constructing the pipeline and depreciable with it." Portland General Electric Company v. United States, *supra*, also allowed depreciation on the cost of clearing the right-of-way therein involved.

Plaintiff further alternatively contends that it is, in any event, entitled to right-of-way depreciation on the basis of its gas reserves. The theory is that the useful lives of the rights-of-way are dependent upon the period of time that the transmission line can be operated and that such period is, in turn, dependent upon when the sources of supply of natural gas available to plaintiff would become depleted.[20] This natural resource reserve basis of right-of-way depreciability has been upheld in Northern Natural Gas Company v. O'Malley, 277 F.2d 128 (8th Cir. 1960), and Commonwealth Natural Gas Corp. v. United States, *supra*, both cases involving natural gas transmission companies. Plaintiff produced much testimony directed toward estimating the useful life of its private gas reserves, and the parties have argued the point extensively. However, in view of the above disposition of the dispute, it is not necessary to consider this alternative contention.[21]

For all of the above-mentioned reasons, plaintiff is entitled to a recovery on this item measured by the amount produced by allowing appropriate annual depreciation deductions for the years herein involved on the above-mentioned right-of-way acquisition costs, as well as on the surveying, clearing, and grading costs in issue, as hereinabove set forth.

### PROPERTY ACQUIRED WITH BONDS AT BELOW PAR

In 1931, plaintiff's predecessor went into receivership and proceedings for its reorganization were instituted under the Bankruptcy Act. Pursuant to the reorganization plan, plaintiff was organized and, as of December 31, 1935, acquired all of the assets of its predecessor.

Plaintiff assumed the predecessor's outstanding first mortgage bonds, which were not in default. However, plaintiff issued "adjustment mortgage bonds," as well as stock, to the holders of the predecessor's debentures and preferred stock and to the unsecured creditors. The adjustment bonds bore interest at 6 percent per annum, had a face value of $100, and were payable in 1960 at par. They were, on any interest payment, redeemable at plaintiff's option at face value plus accrued interest.

To determine the cost to it of the depreciable capital assets which it acquired from its predecessor (it having been de-

---

veying, clearing, and grading the lines, and depreciation of such costs has also been allowed by the Revenue Service.

20. The depreciation rates of the right-of-way acquisition costs on plaintiff's gathering systems are based on estimated lives of from ten to twenty years, depending upon the estimated reserve of gas in the particular field involved. *Cf.* Shell Pipe Line Corporation v. United States, *supra* n. 11.

21. Plaintiff, as an interstate natural gas pipeline company, is required to keep accounts in conformity with the requirements of the FPC's Uniform System of Accounts. Under this system, plaintiff's right-of-way, surveying, clearing, and grading costs are capitalized and depre-

ciated annually. Such depreciation charges thus become a part of plaintiff's cost of service for its regulated sales. Although determinations by utility regulatory agencies as to how certain expenditures should be treated are not binding on the Commissioner of Internal Revenue (Old Colony R. Co. v. Commissioner of Internal Revenue, 284 U.S. 552, 562, 52 S.Ct. 211, 76 L.Ed. 484 (1932)), some courts have, in tax cases, given weight to the accounting requirements imposed upon a public utility by such agencies. See Portland General Electric Company v. United States, 189 F.Supp. 290 (D.Ore. 1960), affirmed, 310 F.2d 877 (9th Cir. 1962); Shell Pipe Line Corporation v. United States, *supra*, n. 11. But see Badger Pipe Line Company v. United States, *supra* n. 10.

termined that the transaction was a taxable one), plaintiff first calculated the total fair market value of the securities which it had assumed and issued for all of the assets it had received. On the basis of such valuation ($23,979,394.23), plaintiff then concluded that the cost to it of the part thereof which constituted depreciable fixed capital assets was, as of December 30, 1935, $20,979,436.12. In arriving at these figures, the $100 par value adjustment mortgage bonds were valued at $71.50 as of the issue date.[22] Plaintiff's calculation of the cost to it of the depreciable fixed capital assets, based on said calculation of the value of the securities issued and assumed by it in exchange for such assets, was set forth in a letter to the Commissioner of Internal Revenue, and plaintiff's proposals were accepted by the Commissioner.

On its tax returns for the years 1936 through 1940, plaintiff claimed and was allowed depreciation deductions with respect to the assets it acquired from its predecessor based on said cost figure of $20,979,436.12.

Based on the $71.50 valuation of the adjustment mortgage bonds as of their December 30, 1935 issuance date, the total fair market value of the bonds (which was also the cost basis of the property acquired therewith) was $1,647,749.37 less than the $100 par or face value of the bonds. On the theory that in 1960, when the bonds would be payable at par, it would then be paying $1,647,749.37 in excess of what the fair market value of the property was as of its acquisition date, plaintiff treated said amount as an amortizable expense to be written off in equal installments over the 24-year life of the bonds.

In 1936, plaintiff incurred expenses totaling $25,547.07 in connection with the issuance of the bonds, and in 1939, it incurred additional expenses with respect thereto in the amount of $3,481.66. Plaintiff similarly treated these expenses as amortizable over the life of the bonds.

In accordance with such treatment, plaintiff, in its returns for the years 1936–1940, claimed, and was allowed, deductions for amortization of said $1,647,749.37 difference between the fair market value of the bonds on their issuance date and their par value. It was also allowed a deduction for bond expense amortization.

In 1941, plaintiff elected to redeem the adjustment mortgage bonds at face value for cash. As of the redemption date, the difference between their 1935 issuance date fair market value and their face value which, under plaintiff's treatment, still remained to be amortized, was $1,304,884.19. Similarly, the total of the above-mentioned bond issuance expenses which was as yet unamortized amounted to $22,808.16. On its return for that year, plaintiff claimed an amortization deduction of $1,327,692.35, being the total of said two figures. However, such deduction was disallowed by the Commissioner of Internal Revenue and constitutes the basis of the present controversy on this portion of the case.

As to the issue relating to the difference between the fair market value of the adjustment mortgage bonds on their issuance date and their par value, plaintiff analogizes its situation to one in which a cash sale of bonds is made at a discount. Where, for instance, the issuer of a 4 percent bond, payable in 25 years at its face value of $100, receives, on its issuance, only $75 in cash, the $25 difference between the issuance price and the face value payable at maturity, referred to as "bond discount," is regarded as a cost or expense of issuing the bond. It is sometimes regarded as in the nature of interest additional to that specified in the bond. Such expense or loss, resulting from the issuer's being required to pay, in the above instance, $25 more to retire the bond than it received on issuance, is regarded as property proratable and amortizable over

---

22. The predecessor's first mortgage bonds which plaintiff assumed were valued at par. Plaintiff's "Class A" common stock was valued at $7.50 per share and its "Class B" common stock at $3 per share.

the life of the bonds, thus producing an annual charge of one dollar.

Although no Code provision deals with the tax treatment of such a "bond discount" expense, the regulations applicable to the year 1941 (as do the current regulations) provided that "[i]f bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds,"[23] and the practice has received judicial sanction. Helvering v. Union Pacific R. Co., 293 U.S. 282, 55 S.Ct. 165, 79 L.Ed. 363 (1934). The expenses of issuing bonds are also amortizable over the life of the bonds, and the same regulations further provide that, if bonds which have been issued at a discount are retired prior to their maturity date, the unamortized bond discount and issuance expenses are deductible in full in the year of retirement.[24]

Plaintiff argues that no distinction may fairly be made between the situations where bonds are sold for cash at a discount and where, as here, bonds are issued for property the fair market value of which is less than the face amount of the bonds. It points out that had it sold the bonds for cash at their then value of $71.50, and then used the cash to pay for the predecessor's assets, the unamortized bond discount would have been deductible in full in 1941, the year the bonds were retired. It contends that "[f]rom the standpoint of the issuing corporation, it makes no difference whether the transaction is handled in one step (by issuing bonds directly to the seller) or in two steps (by issuing bonds to the public and paying the proceeds to the seller). In either event, the difference between the value of the bonds and the amount payable at maturity represents an adjustment in the stated interest rate which should be amortizable over the life of the bonds." (Pltf.Brief at 58)

However, the rule in this court on this issue appears to have been settled in Mon-

tana Power Company v. United States, 159 F.Supp. 593, 141 Ct.Cl. 620, cert. denied, 358 U.S. 842, 79 S.Ct. 23, 3 L.Ed. 2d 76 (1958). In that case, the taxpayer corporation issued 30-year debentures for which it received in return property valued at less than the face amount of the debentures. When, well prior to the expiration of the 30-year period, the corporation retired the debentures at face amount, it claimed, again upon the analogy of a corporation selling bonds for cash at a discount, a deduction in the amount of the difference between the value of the property it received (i. e., the value of the debentures upon the issuance date) and the face amount of the debentures. The court, however, sustained the disallowance of the claimed loss deduction, holding that, as long as the property received for the securities is held, no "loss" can properly be considered as having occurred. Until a "loss" (or gain) is actually "realized" by the sale of the property, the court held, "no tax consequences" (159 F.Supp. at 595, 141 Ct.Cl. at 624) arise from the fact that the taxpayer, at the time of the purchase of the property, may have paid, whether by cash or by a promise to pay in the future (i. e., by debentures or bonds), more for the property than it was worth. The "bad bargain" would properly be evidenced, the court pointed out, only on the corporation's financial statement at the time of the purchase of the property, which would show an impairment of net worth by reason of an obligation to pay a sum larger than the property was worth, but, insofar as it reflected a transaction of this kind, net worth on any particular day would not, the court held, be "relevant for income tax purposes." "He must 'realize' his bad bargain, his loss, by selling [the property]." (Id.)

Thus, where debentures or bonds are issued for property and the property is still held when the securities are redeemed at face value, the court refused to consider the situation as equiva-

---

23. Treas.Reg. 103, § 19.22(a)–18(3) (a). The present regulations are § 1.61–12 (c) (3).

24. Treas.Reg. 103, § 19.22(a)–18(3) (b).

lent to a "bond discount" one such as arises from a sale for cash of bonds at less than face value, even though the property may have been worth less than face value when the securities were issued. Since that is the situation of the plaintiff herein, *Montana Power* compels the dismissal of this item of claim.

It is true, as plaintiff points out, that in *Montana Power*, the exchange of the property for the securities was part of a tax-free reorganization with the purchasing corporation therefore taking the assets on the same "basis" as they had in the hands of the seller, while in the instant case the transaction was a taxable one, with plaintiff therefore presumably paying actual market value for the property. However, the *Montana Power* rule was clearly meant to apply to the issuance of bonds for property in either situation, the court specifically stating that its decision was not based on "the discrepancy between the tax basis figure [*i.e.*, the carryover basis assumed by the purchaser resulting from the tax-free nature of the transaction] and the actual value figure [of the property]." (159 F. Supp. at 595, 141 Ct.Cl. at 623). The following holding of the court is, obviously, as applicable to a taxable acquisition as to a tax-free one:

> * * * If one buys something and pays more than it is worth, and more than he can resell it for, there are no immediate tax consequences of this every day occurrence. If, instead of

paying cash, he promises to pay after a period of years, he may regret his bad bargain more, but when he pays, there are still no tax consequences. He must "realize" his bad bargain, his loss by selling. Likewise when he makes a good bargain and gets something worth more than he pays or promises to pay for it, he is not taxed upon his good fortune until he realizes his gain by selling. (159 F.Supp. at 595, 141 Ct.Cl. at 623–624.)

While there is on this issue authority to the contrary, including American Smelting & Refining Co. v. United States, 130 F.2d 883 (3d Cir. 1942), upon which plaintiff strongly relies, this court in *Montana Power* specifically noted:

> We have considered the contrary position on this question taken by the Court of Appeals for the Third Circuit in American Smelting & Refining Co. v. United States, 130 F.2d 883, but we find ourselves unable to agree with it. (159 F.Supp. at 596, 141 Ct.Cl. at 625)[25]

Plaintiff alternatively contends that if it is denied the claimed deduction of $1,-327,692 on its 1941 return representing alleged unamortized "bond discount," such sum should be added back to the cost basis of the property since it was included in the total actually paid therefor when the bonds were redeemed at face value.[26] Thus, the face amount of the

---

25. In Southern Railway Co., 27 B.T.A. 673, 687–688 (1933), it was similarly held, in the situation there involved, that the issuance of bonds for another corporation's securities, the fair market value of which was less than the par value of the bonds, did not give rise to "bond discount," as would be the case where bonds are issued for cash at less than par value. "The promise to pay a greater sum than the value of the property does not establish *ipso facto* the presence of discount in the transaction. * * * the doctrine of nondeductibility of cost of property until its realization through sale or other disposition would deny the claimed deduction." (*Id.* at 688) In Sam H. Harris Theatrical Enterprises, Inc., 1 T.C.M. 352 (1943), the Tax Court,

adopting the principle laid down in Sacramento Medico Dental Building Co., 47 B.T.A. 315 (1942), also held that a corporation which had issued bonds for property, the value of which was less than the face of the bonds, was not entitled, when the bonds were redeemed, to deduct as a loss the difference between such lesser value and the face value of the bonds.

26. Although the difference between the value of the bonds when issued (and presumably the value of the property purchased therewith) and their face value was, as shown, $1,647,749.37, plaintiff did, as noted, take "bond discount" amortization deductions in its 1936–1940 returns. It has, therefore already recov-

bonds would establish the cost basis of the property for depreciation purposes.[27] With such addition to basis, plaintiff would then have been entitled in 1941 and 1942 to larger depreciation deductions. (Only 1941 and 1942 would be so involved because in 1943, sections 112(b) (10) and 113(a) (22) of the 1939 Code were enacted under which plaintiff was thereafter required to use its predecessor's basis rather than its own cost basis in computing allowable depreciation.)

Defendant concedes this alternative contention and no reason is apparent for not implementing the parties' agreement in this respect. Accordingly, plaintiff is entitled to recover on this item in such amount as plaintiff's basis for the properties acquired from its predecessor, increased by the sum of $1,327,692, would, for the years 1941 and 1942, produce additional depreciation deductions with respect to the depreciable properties so acquired.

Finally, plaintiff points out that even if it was not entitled to a "bond discount" deduction in 1941, such claimed "discount" comprised only $1,304,884.19 of the $1,327,692.35 deduction which the Commissioner disallowed, the balance of $22,808.16 representing unamortized bond issuance expenses. Plaintiff claims entitlement to as least this part of the deduction.

This claim defendant also concedes. *Helvering v. Union Pacific R. Co., supra.* Accordingly, plaintiff is also entitled to recover such amount as is produced by its entitlement to a deduction for 1941 in the amount of $22,808.16 for unamortized bond issuance expense.

## EXCESS PROFITS TAX ISSUES

Under the Second Revenue Act of 1940 (Pub.L. No. 801, 76th Cong., 3d Sess.), plaintiff was subject to excess profits

taxes for the years 1941 and 1943. The amount thereof was based on the excess over the normal or base period profits.

The Act also permitted, as new section 124 of the 1939 Code, special amortization, *i.e.*, over a period of five years, with respect to emergency or war facilities. This was in the nature of a relief provision since normally such amortization deductions from gross income greatly exceeded the depreciation deductions that would ordinarily be allowable, and thus would reduce the excess profits gross income.

By the Revenue Act of 1943, certain excess profits tax relief was, in the form of an amendment to section 735 of the 1939 Code, granted to natural gas companies "engaged in the withdrawal or transportation by pipe line, of natural gas." The relief was an extension to such companies of exemptions that had already been granted with respect to "excess output" of mining and timber operations. In the case of a natural gas company, the nontaxable income from exempt excess output (*i.e.*, the excess of the "natural gas units" for the year over the normal output) was derived according to a formula. A unit net income was determined by dividing the net income from the "natural gas property" by the units sold during the year. One-half of such unit net income multiplied by the units of excess output became the "nontaxable income from exempt excess output." (§ 735(b) (5))

Section 735(a) (5) defined "natural gas property" as follows:

The term "natural gas property" means the property of a natural gas company used for the withdrawal, storage, and transportation by pipe line, of natural gas, *excluding any part of such property which is an emer-*

---

ered the difference between $1,647,749.37 and $1,327,692, leaving only the latter amount which was not amortized. Accordingly, only the latter amount is to be added back to "basis," and this is all that plaintiff claims for this purpose. (Pltf's Brief, p. 70.)

27. "The face amount of the bonds issued by petitioner for the property in question must be considered as the cost of the property, since it represented the sum which petitioner was obligated to pay therefor." *Sacramento Medico Dental Building Co., supra* n. 25, at 328.

*gency facility under section 124.* (Emphasis supplied)

Such exclusion of emergency facilities from a company's "natural gas property" thus necessitated the separation of the net income of the "natural gas property" from that of the emergency facilities.

Under section 735(a) (12), the net income from a natural gas property was to be "computed in accordance with the regulations prescribed by the Commissioner * * *." The pertinent regulations (Treas.Reg. 112, § 35.735–2(*l*), 1944 Cum.Bull. 430, 438) provided: (a) "Deductions for depreciation and amortization of operating equipment can be charged directly to natural gas property and other property"; (b) indirect expenses, such as overhead, not directly attributable "to the natural gas property or to other property shall be fairly apportioned between" the two types of property; and (c) the gross income from the "natural gas property shall be the gross income less the costs and proportionate profits attributable to the emergency facilities."

In the computation of the relief from excess profits taxes under section 735 for the taxable years 1942 and 1943,[28] *i.e.*, in calculating the net income from the "natural gas property" to determine the "unit net income," which in turn determines "the nontaxable income from exempt excess output" (*i.e.*, nontaxable income from exempt excess output = units of excess output x one-half of unit net income), the Commissioner of Internal Revenue allocated a portion of the amortization of emergency facilities (over 86 percent for 1942 and over 78 percent for 1943) to the "natural gas property," in the same way that the regulations indicated allocations should be made with respect to overhead and other indirect items "which cannot be directly attributed to the natural gas property or to other property * * *." The effect of such allocation was to reduce the net income from such "natural gas property," as well as the unit net income and, finally, the nontaxable income (which was, as shown, based, in accordance with the prescribed formula, on "exempt excess output").

Plaintiff protested this allocation, which, it contended, resulted in a denial to it of the relief intended by the statute. It argued that such amortization deductions are solely related to property expressly excluded by section 735(a) (5) from being a part of the "natural gas property" and that no part of such deductions should, therefore, be allocated to such "natural gas property." It emphasized the portion of the regulations which provided that "[d]eductions for depreciation and amortization of operating equipment can be charged directly to natural gas property *and other property*" (emphasis supplied) and pointed out that there was no necessity for the allocation since the amounts of amortization attributable to the emergency facilities and of depreciation attributable to the "natural gas property" were both known.

Throughout the trial proceedings, defendant maintained its position that an allocation was necessary to avoid an overstatement of net income from nonemergency facilities.[29] However, in its brief to the commissioner (p. 64) defendant

---

28. No excess profits were imposed for 1942. However, the granting of section 735 relief for such year, as well as for 1943, may result in unused excess profits credit carrybacks to 1941, thus reducing plaintiff's 1941 liability.

29. Defendant's pretrial submission of its contentions stated, with respect to this issue:
 "In order to compute taxpayer's World War II excess profits tax, it is necessary, under Section 735(a) (12) and (b) (5), to compute taxpayer's net income from non-emergency facilities. For this purpose, the defendant submits that the Commissioner of Internal Revenue properly allocated taxpayer's depreciation and amortization between non-emergency and emergency facilities in accordance with the ratio of sales from the two types of facilities. Otherwise, the net income from non-emergency facilities will be overstated and the operation of the emergency facilities will show an unrealistic loss. * * *"

now concedes that "[t]o arrive at net income for purposes of Section 735(a) (12), the deduction for depreciation and amortization should be limited to the amounts directly chargeable to the natural gas property other than emergency facilities," and that no allocation such as was made by the Commissioner should have been made.

Accordingly, in accordance with the parties' present agreement concerning the proper interpretation of the statutes and regulations (no reason being apparent for not accepting the parties' agreement with respect thereto), plaintiff is entitled, with respect to its excess profits tax liabilities for the years 1941 and 1943, to recover such amount as will be produced by calculating, for its taxable years 1942 and 1943, its net income and unit net income under section 735(a) (12) of the 1939 Code, as well as its resulting nontaxable income from exempt excess output under section 735(b) (5), without allocating to its "natural gas property," as defined by section 735 (a) (5), any amortization on emergency facilities.[30]

## INTEREST DURING CON-STRUCTION

As previously noted, plaintiff acquired the predecessor's assets as of December 31, 1935, and, for the immediately following years 1936 through 1942, the tax basis of the assets in plaintiff's hands was plaintiff's cost, since the acquisition was a taxable transaction. However, beginning with 1943, plaintiff was, pursuant to sections 112(b) (10) and 113(a) (22) of the 1939 Code, required to take the predecessor's basis, such "substituted basis" to be adjusted, however, in accordance with section 113(b) (2), for "proper adjustments of a similar nature in respect of the period during which the property was held by the transferor * * *."

For the years 1943–1953, plaintiff claimed an upward adjustment in the basis of the transferred assets by including therein the interest in the amount of $1,035,707.83 that had been paid or accrued by the predecessor during the years 1929 and 1930 with respect to the bonds and debentures it had issued to finance the construction of the system. The depreciation deductions taken by plaintiff during such 1943–1953 years were on such adjusted basis. However, for such years, the Commissioner of Internal Revenue, in determining the basis of the depreciable properties transferred to plaintiff as of December 31, 1935, reduced the amount thereof by eliminating said item of interest during construction. Of course, this elimination from basis served to reduce the annual depreciation deductions. In this item of claim, plaintiff contests such elimination and the resulting annual reductions.

30. A second issue concerning the computation of plaintiff's excess profits taxes for 1941 and 1942 arose from the circumstance that for the year 1939, one of plaintiff's base years, plaintiff claimed and was allowed a deduction in the amount of $20,226.42 for the depreciation of costs incurred in the surveying and clearing of plaintiff's transmission line rights-of-way. This allowance (although similar deductions were, as shown, disallowed for the years 1941–1953 in computing plaintiff's income taxes, and for the years 1941 and 1942 in computing plaintiff's excess profits credit) served to reduce plaintiff's base period income.

In the event the court, on the issue concerning the depreciability, during the years 1941–1953, of the surveying and clearing costs, held against plaintiff and denied deductions therefor, plaintiff, on this excess profits item of the case, made a protective claim to the effect that, if deductions are denied for 1941–1953, the identical deduction should similarly be eliminated for 1939, which would then serve to increase its base period income and decrease its excess profits tax computations for 1941 and 1942 (assuming any such taxes are payable, since a decision in its favor on the emergency-facilities-allocation issue could result in the elimination of all excess profits tax liability for such years anyway). However, the determination that deductions for the depreciation of the surveying and clearing costs are allowable moots this protective claim.

**1242**

The serious obstacle to plaintiff's claim is section 113(b) (1) (A) of the Code which delineates what are the "[p]roper adjustment[s] in respect of the property [which] shall in all cases be made * * *." The reference in the aforesaid section 113(b) (2) concerning "proper adjustments of a similar nature" is to said subsection (b) (1). And such subsection (b) (1) provides, in its subparagraph (A), that proper adjustments shall be made for

> * * * expenditures, * * * or other items, properly chargeable to capital account, *but no such adjustment shall be made for taxes or other carrying charges. * * * for which deductions have been taken by the taxpayer in determining net income for the taxable year or prior taxable years*; * * *. (Emphasis supplied)

The parties are agreed that interest during construction may properly be regarded as constituting a "carrying charge," "properly chargeable to capital account" (as the predecessor did, in fact, charge such interest on its books, in accordance with accepted accounting principles). However, since it turns out that the predecessor did, in its income tax returns for 1929 and 1930, take deductions, as a current expense, for the identical interest here in question in determining its net income for such years, it is plain that the above italicized portion of subsection (b) (1) (A) bars plaintiff's attempt to add to basis such previously already deducted interest.

Plaintiff attempts in various ways to extricate itself from this plainly disabling provision of section 113(b) (1) (A) but its contentions in this respect cannot be accepted.

First, plaintiff says that, although back in 1930 and 1931 when its predecessor filed its aforementioned returns for its 1929 and 1930 tax years, Treasury Regulations 74, Article 561, in terms permitted a taxpayer to elect to add such "carrying charges" to basis instead of deducting them in computing net income, a substantially identical provision in a previous regulation was held, in judicial proceedings, to be invalid. Accordingly, it argues, the predecessor "necessarily felt compelled to deduct the interest on its returns" [31] instead of capitalizing it as permitted by the regulation.

What plaintiff is referring to is as follows:

When the predecessor took the deductions as current expenses on its 1929 and 1930 returns, the pertinent statutory provision was section 111(b) of the Revenue Act of 1928 (45 Stat. 791) which require, in determining gain or loss amounts, that proper adjustment of basis be made for any expenditure "properly chargeable to capital account * *." It was under this provision that the aforesaid Article 561 of Regulations 74, was issued. The regulations similarly provided that basis should be adjusted for any expenditure "properly chargeable to capital account, including * * * carrying charges, such as taxes on unproductive property" and went on to provide further that "[w]here the taxpayer has elected to deduct carrying charges in computing net income, or used such charges in determining his liability for filing returns of income for prior years, the cost or other basis may not be increased by such items * * *."

Section 111(b) of the 1928 Act was similar to section 202(b) of the Revenue Act of 1924 (43 Stat. 253, 255) which, for the first time, had provided that, in determining gain or loss on the sale or other disposition of property, proper adjustment should be made for "any expenditure properly chargeable to capital account." Although the 1924 Act did not define what expenditures would be considered so "properly chargeable," the House Committee Report on the bill [32] stated that under the section, "carrying

31. Pltf.Brief, p. 85.

32. H.R.Rep. No. 179, 68th Cong., 1st Sess. 12–13, 1939–1 (Part 2) Cum.Bull. 241, 250.

charges, such as taxes on unproductive property, are to be added to the cost of the property," and the regulations under such 1924 Act, Treas.Reg. 65, Art. 1561) provided, in a paraphrase of the House Committee Report, that basis must be increased "by carrying charges, such as taxes on unproductive property." And, in 1926, a ruling was issued under the 1924 Act which specifically included interest paid to carry unproductive property and permitted capitalization thereof provided it had not been deducted in computing net income. S.M. 5033, V-1 Cum.Bull. 9 (1926). This was followed in 1927 by I.T. 2386, VI-2 Cum.Bull. 110, which held that no adjustment to cost could be made by capitalizing interest or taxes which had already been deducted in prior years, even though such charges had been capitalized on the taxpayer's books.

Provisions similar to section 202(b) of the 1924 Act were also contained in section 202(b) of the Revenue Act of 1926 (44 Stat. 9, 11–12), and the regulations issued thereunder (Treas.Reg. 69, Art. 1561) similarly referred to "carrying charges, such as taxes on unproductive property."

Thus, says plaintiff, until the Board of Tax Appeals decided differently on October 4, 1929, in Central Real Estate Co., 17 B.T.A. 776, it appeared, ever since 1924, that taxpayers who paid interest, taxes, and other similar charges on unproductive property could, for federal income tax purposes, add such items to basis instead of deducting them currently, as was required prior to the Revenue Act of 1924. In *Central Real Estate,* however, it was held that, although section 202(b) of the 1924 Act provided that, in calculating basis, proper adjustment should be made for expenditures "properly chargeable to capital account," no definition appears in the Act concerning what items are so chargeable, and that, considering the consistent holdings theretofore that "taxes and interest are not capital items, we are satisfied that they do not come within the terms of the Act" (at 780). The Board, noting the inaccurate statement in the House Committee Report to the effect that the allowance of taxes on unproductive property as an addition to basis comported with the construction then being placed on the law by the Treasury Department (since the Department instead had consistently held otherwise, i.e., that taxes and interest were not capital items), (a) rejected the Report as a helpful aid to an interpretation of the Act; (b) noted the failure of the Senate Committee Report on the bill to make any similar statement or, in fact, to say anything about "carrying charges," such report instead stating that the purpose of the section was to allow, as addition to cost, the cost of capital improvements and betterments; and (c) concluded that "[t]he Revenue Act of 1924 does not purport to convert into a capital charge that which was not such a charge under prior acts" and that "since all decisions of the courts and of this Board, and the rulings of the Commissioner prior to Regulations 65, have consistently held that interest and taxes are not capital items, we are of opinion that they may not be capitalized under section 202 of the Revenue Act of 1924" (at 780–81). Thus, the provisions in the regulations theretofore construed as authorizing the capitalization of interest were in effect considered to be invalid. The Board's decision was affirmed on March 18, 1931, in Central Real Estate Co. v. Commissioner of Internal Revenue, 47 F.2d 1036 (5th Cir).[33]

33. " * * * The provision [in section 202 of the Revenue Act of 1924] permitting proper adjustment to be made for any expenditure or item of loss properly chargeable to capital account clearly means such items as add to the value of the property. It would be impracticable for Congress to enumerate in detail what those items might be, but taxes and interest do not fall into that class * * *. All the revenue acts have specifically provided for the deduction of taxes and interest from gross income annually * * *. If Congress had intended to give the taxpayer the privilege of adding taxes and interest to cost, it would have been very easy to have said so. As the act does not so provide, the conclusion is

However, when laid against the record in this case, the above sequence of events cannot fairly be taken as the basis, as claimed by plaintiff, for the predecessor's alleged feeling that, in view of the Board's decision on October 4, 1929 in *Central Real Estate*, it would have been "a futile gesture" (Pltf. Brief, p. 95) to attempt to capitalize interest during construction for 1929 in its 1929 return, filed on June 15, 1930, and similarly, in view of the affirmance of *Central Real Estate* on March 18, 1931, to capitalize such interest for 1930 in its 1930 return filed on July 1, 1931.

The record shows that considerable thought was given to the specific matter in the preparation of such returns not only by the predecessor but by its parent, Tri-Utilities Corporation. The correspondence between those in the two corporations who were responsible for tax matters, such correspondence being referred to by both parties as a contemporaneous clue as to why the returns were filed as they were, is detailed in the findings. And as to 1929, it appears quite plain [34] (despite, concededly, the difficulty of arriving with absolute assurance at conclusions concerning what motivated action taken over 35 years ago) that the real reason it was decided to deduct the interest was, in the words of the parent's tax department manager, as contained in a letter of March 12, 1930 to the predecessor's treasurer, that it was felt "it would be of advantage to take all the deductions in the tax return for the year 1929 that we are entitled to," since it was expected at that time that the company would "earn considerable income in the next few years." With the interest so deducted, the "return will reflect a large statutory net loss," which could, he said, then be carried forward and ap-

plied to the "considerable income in the next few years" which the predecessor "expects to earn." It is quite true that the letter expressed the opinion that "the Revenue Department will not permit a depreciation deduction on such items [interest on bonds during construction] where they are clearly set forth in the fixed capital account," and that it also referred to the deductibility of the item as not being "definitely settled" under "the tax law and regulations." However, despite such uncertainty, the tax manager concluded that "we feel that the return for the calendar year 1929 should reflect all deductions which can possibly be construed to be deductible." Accordingly, the 1929 return was filed in such manner by the predecessor.

It seems quite clear, therefore, that the 1929 return was filed in the way it was because it was considered to be to the predecessor's tax advantage to do so, and not under the compulsion of *Central Real Estate,* which was not even mentioned in the letter. Indeed, the letter, if anything, indicates that the manager entertained doubt, under the then state of the law, that the predecessor *could* deduct the interest.[35] His feeling was, quite clearly, founded upon the fact that the statutes and the regulations all provided, in mandatory terms, that basis "shall be adjusted" for any item properly chargeable to capital account, the so-called "election" to deduct seemingly referring not to the future but instead to past years, capitalization, pursuant to the statutes and regulations, not being permitted if the taxpayer had previously elected to deduct. Thus, despite the predecessor's doubt as to the propriety of its action (the Commissioner of Internal Revenue had not acquiesced in the invalidation of his regulation requiring

inescapable that Congress did not so intend. * * * " (47 F.2d at 1037)

34. Finding 64.

35. After stating that he had been informed that the company expected to "earn considerable income in the next few years" and that he therefore felt all pos-

sible deductions should be taken for 1929, he continued: "It must be understood that the tax law and regulations have not definitely settled the deductibility of certain expenses covering situations such as yours, but we feel that the return for the calendar year 1929 should reflect all deductions which can possibly be construed to be deductible."

capitalization, with the Board's decision in *Central Real Estate* then, in addition, being on appeal),[36] it deliberately went ahead and deducted the interest anyway because of the considerable tax advantage it felt would accrue to it as a result. Thus, to say, as plaintiff now does, that the predecessor, although it wished to capitalize, felt compelled, because of the then state of the law, to deduct the interest rather than to capitalize it, is to advance a contention which is simply not borne out by the record.

For 1930, the reason for the predecessor's filing the return as it did, with the interest again deducted, is not as clear. Prior to the time of such filing on July 1, 1931, it apparently had become obvious to it, as set forth in a letter of June 12, 1931 from the predecessor's official responsible for the preparation of the return to the parent's tax department manager, that such deduction "will no doubt not be of any use as far as building up a loss to be carried forward is concerned," and that if capitalized, it "would realize * * * yearly write-off of depreciation" which "would be very advantageous to Southern Natural Gas, as it would approximately increase the depreciation write-off $100,000 each year." He suggested amending the already filed 1929 return, as well as the prepared draft of the 1930 return "so that we can then consider the interest as part of the depreciable property."[37] It is, therefore, puzzling why, in view of the fact that the parent's tax manager, in his letter of June 15, 1931, agreed with the recommendation of the predecessor's tax official that the interest be capi-

talized, the predecessor nevertheless went ahead and filed the return anyway with the interest deducted as a current expense. The only possible conclusion is that the predecessor again acted as it did with respect to the 1929 return in the manner it ultimately determined was, for reasons best known to itself, in its best interests, and certainly not under any supposed legal compulsion, which is not even hinted at in the correspondence. The manager did not consider that the problem as it then existed—although *Central Real Estate* had already been decided by the Court of Appeals (and which case again was not even mentioned in any of the letters, although other specific citations were made)—was settled in such a manner as to require one course of action rather than another, for he advised: "Upon reviewing the situation again [including a recent memorandum of the General Counsel of the Revenue Service] I believe that the question of how to handle Interest during Construction has not been definitely settled by the Treasury Department * * *."[38] The predecessor's official in his letter had also noted that "the question of the capitalization of interest and taxes in computing gains * * * is still pending." Again there was at that time nothing to indicate that the Commissioner of Internal Revenue was going to acquiesce in the invalidation, in the Fifth Circuit, of his regulation to the detriment of those who had relied on it and the succeeding substantially identical regulations. When one gives full consideration to the pros and cons, and there is no indication that a certain course of action was felt to be compelled, the only

36. The Board of Tax Appeals affirmed the Commissioner's action in denying the taxpayer's claim but arrived at its result on grounds that were broader than those urged by the Commissioner. The Board interpreted the statute as precluding the capitalization of interest during construction, while the Commissioner merely took the position that, as he had held in I.T. 2386, the attempted capitalization could not be effected because the taxpayer had previously deducted the interest. In *Jackson v. Commissioner of Internal Rev-*

enue, 172 F.2d 605 (7th Cir. 1949), which involved the same question as *Central Real Estate*, the Commissioner, although agreeing with the result of *Central Real Estate*, disagreed with the basis thereof and the Board's reasoning. The court in *Jackson* agreed with the Commissioner and sustained the validity of Article 1561 of Regulations 69 promulgated under the 1926 Revenue Act.

37. Finding 66(a).

38. Finding 66(b).

rational conclusion is that that course of action was adopted which was determined to be in one's best interests. That was exactly the way the predecessor had acted in 1929, and the presumption must be that it similarly so acted in 1930. Indeed, plaintiff does not urge that 1930 be treated any differently from 1929. In any event, what is plain is that plaintiff has failed to carry its burden of proving that the predecessor in filing its 1930 return, deducted the interest only because it felt it had no other choice.

■ Accordingly, the fact, which plaintiff stresses, that it turned out the predecessor never realized any tax benefits from the interest deductions it took, either for the 1929 and 1930 years themselves (since the heavy losses it suffered in those years would have resulted in no income tax being due even had such deductions not been taken), or for any subsequent year (since losses were incurred during all the years to which the 1929–1930 loss credits could have applied), must be considered to be irrelevant in view of the further fact, as shown, that the predecessor fully contemplated (at least at the time it filed its 1929 return) that such tax benefits would accrue. As the Court said in Pacific National Co. v. Welch, 304 U.S. 191, at 194, 58 S.Ct. 857, at 858, 82 L.Ed. 1282 (1938), "[t]he amount of the tax for the year in question is only one of many considerations that may be taken into account by the taxpayer when deciding which method to employ." Even the method which produces a higher tax for the year in question may, the Court pointed out, be considered "preferable because of probable effect on amount of taxes in later years." (*Id.*) The circumstance that the benefits expected at the time an election is made do not materialize does not give a taxpayer the subsequent right to start all over again and adopt *ab initio* that method which hindsight makes plain would have been more beneficial. "There is nothing to suggest that Congress intended to permit a taxpayer,

after expiration of the time within which return is to be made, to have his tax liability computed and settled according to the other method." (*Id.*) *Cf.* Gimbel Brothers, Inc. et al. v. United States, 404 F.2d 939, 186 Ct.Cl. 299 (1968).

It thus becomes unnecessary to decide the issue of what would be the legal implications flowing from a situation, were it factually proved, in which a taxpayer reasonably felt that because of the state of the law, he was in effect compelled to file in a certain manner, and whether a choice made under such circumstances could later be disregarded and a different course of action, in conformity with clarifying subsequent provisions of the statutes and regulations, then be pursued.

■ Plaintiff further argues, however, that by reason of amended returns for 1929 and 1930 which were later filed by the predecessor, in which the deductions for the interest were eliminated, it is now not barred under section 113(b) (1) (A) by the deductions therefor taken in the original returns. This contention too is unacceptable because the record does not indicate that such amended returns were ever accepted by the Commissioner of Internal Revenue and that they are, therefore, to be given any force and effect. Since, as plaintiff concedes, the 1939 Code contained no statutory provision for the filing of amended returns, such returns must be regarded without such acceptance merely as untimely filed returns for the years they purport to amend. Daniels Jewelers, Inc. v. United States, 279 F.2d 226, 150 Ct.Cl. 525 (1960).

What the record shows as to these amended returns is as follows:

On August 6, 1931 (*i.e.*, a little over a month after plaintiff had filed its 1930 return), Treasury Decision 4321 [39] was issued amending the above-mentioned Article 561 of Regulations 74 promulgated under section 111(b) of the Revenue Act of 1928, the Fifth Circuit, on March 18, 1931, having held in *Central*

---

39. X–2 Cum.Bull. 169 (1931).

*Real Estate* that the similar regulation under the similar section of the 1924 Act could not be supported by the provisions of such section. In conformity with *Central Real Estate*, the amendment provided that carrying charges may not be treated as items properly chargeable to capital account. It made a savings exception, however, as to those cases in which such expenditures made prior to the date of the issuance of the amendment had been charged to capital account by taxpayers in their tax returns (in reliance on the previous regulations).[40] Accordingly, those taxpayers who, despite the capitalization requirement provisions of the original regulation, had elected to deduct such charges in computing net income, as the predecessor had done, were not allowed to change such election.[41] Thus, had the predecessor complied with the regulations and capitalized the interest, its action would have been preserved despite *Central Real Estate* (and this issue in this case would not have arisen).

The following month, *i.e.*, on September 21, 1931, the predecessor filed with the Collector in Birmingham, Alabama, an amended return for 1929 in which the interest during construction item was eliminated as a deduction and instead capitalized as a construction cost, and on September 23, 1931, the Collector acknowledged its receipt and advised it was being forwarded to Washington "to be audited in connection with the original."

An amended return was also prepared at that time for 1930 which also capitalized the interest but only the amount that had been paid or accrued up to April 1, 1930, the date the main transmission line was completed. However, as shown by a letter dated September 17, 1931, from the predecessor's tax official to the parent's tax department manager,[42] its filing was delayed because one of the predecessor's receivers raised the question of whether the entire system could, under T.D. 4321, still be considered "unproductive" during that year because, even though the main transmission line was completed, it took practically the entire balance of the year to construct the lateral lines, the service lines, and the meter stations, so that the company could still be considered as being in a construction or development stage during the entire year, the operating activities being, in his opinion, only "incidental" to the "major problem" of completing the construction program. By letter of October 3, 1931, however, the tax manager replied that since a large part of the system had actually been put into service in 1930, and had thus become productive, it was his conclusion that T.D. 4321 would not support the capitalization of all the interest expended during the entire year. He therefore recommended the filing of the amended return as prepared.

The receiver, however, by letter of October 22, 1931, requested the manager to reconsider his opinion, stating that one of the local tax examiners (Birmingham, Alabama) had expressed the opinion that until the company had actually commenced operating with respect to 75 percent of its proposed business, it would still be considered to be in a development or construction stage. Because of the company's "potential earning power,"

---

40. "In computing the amount of gain or loss, however, the cost or other basis of the property shall be properly adjusted for any expenditure, receipt, loss, or other item properly chargeable to capital account, including the cost of improvements and betterments made to the property since the basic date. Carrying charges, such as interest and taxes on unproductive property, may not be treated as items properly chargeable to capital account, except in the case of carrying charges paid or incurred, as the case may be, prior to August 6, 1931, by a taxpayer who did not elect to deduct carrying charges in computing net income and did not use such charges in determining his liability for filing returns of income." X–2 Cum.Bull. 169 (1931).

41. Section 605 of the Revenue Act of 1928 gave the Treasury the power to apply a change in the regulations without retroactive effect.

42. Findings 69(a), 70(b).

he stated, the receivers desired "to treat all interest paid or accrued during the year 1930 as part of the construction cost." [43] In his reply of October 26, 1931, the manager stated that (1) "[t]he matter of how to treat 'interest during construction' is one which has not been definitely decided by the Bureau of Internal Revenue," and (2) the question of when construction may be considered to be completed is a factual one. Therefore he concluded that if the predecessor considered his previous opinion as to the procedure to be followed to be "detrimental to the interests of the company," it should, despite the previous judgment he expressed outlining a procedure he felt would be acceptable to the Bureau, not consider such judgment as "binding" and should proceed to file the amended return with all the interest capitalized.[44]

On December 26, 1931, the predecessor filed its amended return for 1930 with all the interest capitalized.

Apparently the receivers were, however, in doubt as to whether a return had in fact been filed since by letter of May 16, 1932, they made inquiry of the Birmingham Revenue Office with respect thereto. The following day the office advised that such a return had been filed and that, as with the 1929 amended return, it had been forwarded to Washington to be audited in connection with the original return.

■■■ And here the record stops insofar as the amended returns are concerned. Thus, outside of clearly indicating that, with these returns as with the originals, the predecessor still, as of the dates of their filing, did not feel it was under any legal compulsion to file in any particular manner (it believing that, even at such filing dates, the proper treatment

of the interest during construction item was "one which has not been definitely settled by he Bureau of Internal Revenue"), and was still taking that course which it considered to be in its best corporate interests, the record fails to make plain whether such returns were ever accepted by the Commissioner of Internal Revenue. An acceptance in this case, which is purely discretionary (*Daniels Jewelers, Inc., supra*), would be vital for the predecessor was, in such returns, taking a position which was expressly forbidden by the amended regulation *i.e.*, after August 6, 1931, it was for the first time capitalizing the interest although the amendment specifically permitted such treatment only if such capitalization had been made, in reliance on the original regulation, in returns filed prior to such date. As shown, the predecessor knowingly and consciously did not take such action. Under the circumstances there could be no presumption of acceptance, and this would be so even though, as plaintiff points out, no tax was due under either the original or amended returns, for the capitalization treatment, although not affecting the tax liability for either the years 1929 or 1930, obviously might, because of the company's "potential earning power," affect such liability for many future years.[45]

■■■ As indicating acceptance of the amended returns by the Commissioner, plaintiff places heavy reliance on the report made by an examining revenue agent with respect to its 1932 return. The predecessor's 1931 return contained no depreciation deductions, but the 1932 return did claim such a deduction with respect to the interest capitalized on the 1929 and 1930 amended returns. Such 1932 return, which showed a loss of al-

---

43. Finding 70(b).

44. Finding 70(c).

45. No reliance can, of course, be placed on the form letters, dated October 24, 1931, with respect to the year 1929, and January 9, 1933, with respect to the year 1930, which the predecessor received from the Nashville Revenue Office advising

that the office "is recommending to the Commissioner of Internal Revenue that your income tax returns [for such years] be accepted as correct." (Finding 72) Both letters made plain that the recommendation was "subject to approval in Washington." In addition, there is no indication that the letters referred to the amended returns and not the original returns.

most a million dollars, was reviewed by the Nashville Revenue Office and then forwarded to Washington "for final review." Plaintiff argues that, in computing allowable depreciation on this audit, "the Internal Revenue Service treated the 1929 and 1930 interest payments as an addition to basis, in accordance with the capitalization election made on the amended returns." (Pltf. Brief, p. 109) This contention cannot be accepted for two reasons. First, the report of a field office sent to Washington "for final review" does not constitute proof of acceptance by the Commissioner of Internal Revenue. Such basic year-to-year changes in accounting procedures which may drastically affect tax liability over the years must necessarily be subject to approval by the Commissioner of Internal Revenue. Second, in his report the Nashville Office's reviewing agent stated that he was making no attempt to determine the extent to which the deductions claimed were allowable because he would, in any event, be unable to overcome the huge loss reported. Accordingly, he stated he was not submitting a corrected net loss schedule. In one exhibit attached to the report consisting of a reconciliation of the net losses for 1929 through 1932, as shown by the corporate books and the tax returns, the agent did refer to the losses for 1929 and 1930 "as disclosed by the amended returns," and in subsidiary exhibits also referred to the amended returns for such years. However, no computation of "allowable depreciation for 1932" was made.

■ For the agent's purpose of making such a comparison or reconciliation, it would, of course, be quite natural to look at the amended returns, for those returns, capitalizing the interest, were the only ones that could, with respect to this item, be compared with the corporate books, in which the interest was also capitalized. But a field office agent's looking at the amended returns for this limited purpose in connection with an audit of a different and subsequent year's return can hardly be considered as constituting an acceptance of the amended returns for the earlier years, including the legal propriety, under the circumstances here involved, of the change from one method of treating interest during construction to another. This is especially true in light of his further explanation that he did not even audit the depreciation schedule for such subsequent year's return because "the large net loss cannot be overcome."

Daniels Jewelers, Inc. v. United States, *supra*, on which plaintiff relies, is inapposite. There, waiver by the government of the timeliness of an election, which depended on the acceptance of an amended return in which the election was made, was necessarily indicated by the government's subsequent action of assessing a deficiency for one of the years with respect to which the amended return was filed. Because of the statute of limitations, the assessment could not have been made but for the acceptance of the amended return. Here, there is nothing in the nature of similar action by the Commissioner indicating any acceptance of the amended returns.

■ The Commissioner's mere failure to act upon the election set forth in the amended returns cannot, of course, be taken to indicate acceptance. Kaufmann & Baer Company et al. v. United States, 137 F.Supp. 725, 133 Ct.Cl. 510, cert. denied, 352 U.S. 835, 77 S.Ct. 54, 1 L.Ed.2d 54 (1956).

For all of the above reasons, it is concluded that plaintiff is not entitled to recover on this item of claim.

## DEPRECIATION BASIS OF PROPERTY PURCHASED WITH PREFERRED STOCK

As above indicated, for the property plaintiff acquired from its predecessor in 1935, plaintiff is required, commencing with 1943, to take the predecessor's depreciation tax basis. The parties are in agreement that, under section 113(a) of the 1939 Code, such basis is predicated upon the cost of the properties to the

predecessor.[46] In this item of the case, the parties are in dispute as to the amount of such cost.

Had the predecessor paid for its system in cash, its cost would, of course, be readily ascertainable. However, the dispute here arises from the circumstance that, in connection with the construction of the original line in 1929 and 1930, the predecessor made part payment to some of the contractors and materialmen participating in the construction in the form of its $7 cumulative preferred stock. The predecessor was then a newly organized corporation in the initial stage of constructing its system. The preferred stock in question was newly issued and was neither listed on any exchange nor traded over the counter. Such private sales as had occurred were insignificant. Accordingly, it had no established or readily ascertainable market value or price. Yet, the cost to the predecessor of its system, which cost fixes the depreciable tax base, depends upon a determination of the value of the stock it gave to the contractors and suppliers for the property it received from them.

The predecessor initiated the stock payment program in the summer of 1929 in an effort to conserve its cash. Some contractors, by their contracts, agreed to accept such payment. Others also ultimately accepted such stock as part payment although their contracts did not so require.

The number of shares issued for the portion of the properties so purchased by the stock was based on agreements between the predecessor and the participating contractors and suppliers that they would receive one share for every $90 worth of contract services rendered or materials furnished. The physical assets or services received by the predecessor from the contractors and suppliers were entered on its books at the contract or agreed prices, which were then settled by payment of cash and preferred stock at $90 per share. In calculating its cost of such assets and services for the purpose of computing its depreciation base, the predecessor considered the stock as having a value equal to $90 a share, and its annual depreciation deductions were taken on such a cost basis.

For the years 1943 through 1953, however, the Commissioner of Internal Revenue made certain determinations relating to the preferred stock which drastically revised plaintiff's depreciable tax basis. He determined that the predecessor had issued 31,797 shares of preferred stock to pay for $2,869,809.95 in materials and services. He then reduced said amount by $1,559,445.95, a reduction which was produced by his rejecting the $90 per share valuation assigned by the predecessor and instead assigning values ranging from $45 per share for the first shares issued at various times between October 1929 and April 1930, to $24.66 per share for the final shares issued in February 1931. This reduction in basis had the effect, of course, of diminishing the depreciation deductions allowed in each of the years in question.

The parties are now in agreement that the Commissioner included too many shares in his calculation of the number that was issued by the predecessor as payment for depreciable services or materials incorporated in such lines as were still in existence during the tax years in question. However, they remain in disagreement as to what the proper number should be. There is agreement that at least 21,040 shares were so issued on various dates from October 7, 1929, through February 18, 1931. However, defendant maintains that on October 24, 1929, 5,700 shares were issued to the firm of Ford, Bacon & Davis and that, although the books and records of the parties reflect the transaction as a purchase by the Ford firm of the shares at $87.50 per

46. Section 113(a) of the 1939 Code provides:
"(a) Basis (unadjusted) of property.— The basis of property shall be the cost of such property * * *."

share (plus accrued dividends), the issuance of the shares was in reality in part payment of a $500,000 fee due such firm for services rendered in designing the transmission system and supervising its construction. Thus, defendant argues that the value of 26,740 shares is involved, not 21,040.

Further, defendant now maintains that even the reduced share values assigned by the Commissioner of Internal Revenue were too high and that the fair market value of the 26,740 shares allegedly involved ranged, as of their issuance dates, from $35 per share on October 7, 1929, to a low of $5 per share for the final November 20, 1930–February 18, 1931 period. On this basis, defendant contends there should be a reduction of $1,774,625 in basis, representing the difference between the book value of $2,392,350 for the property and services allegedly acquired with the 26,740 shares of stock [47] and the fair market value of such stock in the alleged amount of $617,725.

Plaintiff, however, insists that the issuance of the 5,700 shares to Ford, Bacon & Davis was in pursuance of a straight sale and purchase and had nothing to do with payment for services, that the correct number of shares issued in payment of depreciable assets is, therefore, only 21,040, and that such number was correctly incorporated into the depreciation base at $90 per share, being the agreed value assigned by the predecessor and its contractors and suppliers.

For the reasons hereinafter set forth, it is concluded that plaintiff is correct on both aspects of this controversy.

■ Consideration will first be given to the question of the measure of the cost basis to the predecessor of the property and services acquired by the shares, which both sides agree should be based upon the value of the shares. Irving Trust Co. v. United States, 90 Ct.Cl. 310, 30 F.Supp. 696, cert. denied, 311 U.S. 685, 61 S.Ct. 60, 85 L.Ed. 442 (1940).[48]

Other than the value assigned to the shares by the contracting parties, there was, for the reasons indicated, no readily ascertainable basis for determining value. No persuasive reason is apparent, however, for not accepting the contemporaneous value judgments of experienced businessmen with adverse interests and negotiating at arm's length. Here the contractors agreed that for every $90 worth of labor, materials, or services they gave the predecessor under their contracts, they would receive one share of preferred stock. The only natural conclusion is that they considered the stock had such an equivalent value, for it is hardly to be supposed that established business firms of national repute, as many of the contractors and suppliers were, were either in effect duped into giving $90 worth of labor, material, or services for as little as $5, or were indulging in some kind of charitable exercise. Defendant does not question the $90 value of the services and materials furnished. It questions only the correlative stock value. Thus, the logical conclusion of defendant's position is necessarily that the predecessor obtained that part of its system represented by the stock in question at an astounding bargain, *i.e.*, it received $2,392,350 worth of property and services for only $617,725.

■ The cases too support the logical conclusion that, in a situation such as here involved, the value of the stock, for the purpose of establishing "cost" as basis under the income tax laws, is to be presumed to be equal to $90, the conceded value of the materials and services for which the stock was exchanged.

47. 21,040 shares at $90.00=$1,893,600
 5,700 shares at 87.50= 498,750
 —————————
 2,392,350

48. "Where a corporation acquires property by the issuance of its own stock therefor, and the persons to whom its stock is issued are not in control of the corporation after receiving the stock, the cost to the corporation acquiring the property is, of course, the value of its stock issued therefor." (30 F.Supp. at 702, 90 Ct.Cl. at 323.)

■ Where the stock is exchanged for property, and a determination of the value of the stock is therefore necessary to establish "cost" for tax purposes, "the best available criteria of the market price of the stock" is, normally, sales of the stock made in the open market. Tennessee Products Corp. v. United States, 107 F.Supp. 578, 587, 124 Ct.Cl. 1, 18 (1952).

■ However, where, as here, no sales of the stock have for all practical purposes been made, so that the stock has no readily ascertainable market value, but the property received in exchange for the stock does have such a value and therefore constitutes the best evidence of the fair market value of the shares, then the operation of the presumed-equivalence-in-value rule comes into play, *i.e.*, "the value of the two properties exchanged in an arms-length transaction are either equal in fact, or are presumed to be equal." Philadelphia Park Amusement Co. v. United States, 126 F.Supp. 184, 189, 130 Ct.Cl. 166, 172 (1954). In that case, the taxpayer exchanged a bridge for the grant by a city of a 10-year extension of a railway franchise. It subsequently became necessary to establish, for tax purposes, the cost basis of the franchise extension. This court held that, if such franchise extension value was "difficult or impossible to ascertain because of the nebulous and intangible characteristics inherent in such property," the fair market value of the bridge, which was subject to a reasonably accurate determination, would, in accordance with such equivalence rule, "be presumed to be the value of the extended franchise." (126 F.Supp. at 189, 130 Ct.Cl. at 173) And this rule was applied in United States v. Davis, 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962), a case, such as the instant one, involving an exchange of stock for property, and which specifically approved and relied on *Philadelphia Park*. In *Davis* the Court held that, in connection with a property settlement incident to a divorce proceeding, the measurement of the taxable gain realized by the husband on stock exchanged for a release of the wife's marital rights (as well as of the wife's "cost" basis for the stock) would be based on the fair market value of such rights, and that these rights, the independent value which was not, of course, readily ascertainable, must be considered "to be equal in value to the property for which they were exchanged."

\* \* \* Absent a readily ascertainable value it is accepted practice where property is exchanged to hold, as did the Court of Claims in Philadelphia Park Amusement Co. v. United States, 126 F.Supp. 184, 189, 130 Ct.Cl. 166, 172, (1954), that the values "of the two properties exchanged in an arms-length transaction are either equal in fact, or are presumed to be equal. [cases cited]" (*Id.* at 72, 82 S.Ct. at 1194)

Indeed, although the use of such "barter-equation method" to evaluate property is normally limited to "cases involving valuation of property for which there is little or no market," Seas Shipping Company v. C. I. R., 371 F.2d 528, 529 (2d Cir.), cert. denied, 387 U.S. 943, 87 S.Ct. 2076, 18 L.Ed.2d 1330 (1967), its use to evaluate stock in a particular situation has been sustained even "where there is an active market for the property to be valued [*i.e.*, the stock]" (*id.* at 532) (the small transactions on the stock exchange being considered as not truly reflecting many of the value aspects of the transaction involving the large block of shares exchanged in the ship-stock transfer that was the subject of the case).[49] Here too the court was troubled by the improbable results that would follow from giving the stock a value different from that assigned by the parties themselves.

\* \* \* If the trading price of $22.81 were taken as the stock's value, it would mean that taxpayer had sold

---

49. The same result obtained in the companion Tax Court case of Moore-McCormack Lines, Inc., 44 T.C. 745 (1965), both cases arising out of a sale of ships by Seas Shipping Company to Moore-McCormack Lines for cash, notes, and 300,000 shares of stock.

its ships for $2,000,000 less than they were worth [the ships' value being known and not in controversy]—a highly unlikely occurrence. * * * Where parties with adverse interests are at issue over the worth of property and then agree upon the dollar amount of that worth, the agreement is very persuasive evidence of value. (*Id.* at 532)

Certainly, here the predecessor and the experienced firms which were its construction contractors and suppliers were contracting parties with adverse interests and bargaining at arm's length. They were unrelated to the predecessor. The record fails to indicate that any contractor was compelled to take stock for any part of his services or was, for instance, threatened with the loss of the predecessor's business if he did not participate. When National Tube Company refused to take any stock for its services because of a policy not to participate in financing, the predecessor continued to do business with it on an all-cash basis. Other contractors, too, did not, for one reason or another, participate. Under the program, the greatest percentage of the contract price the contractors were asked to accept in stock was 25 percent. Some took less. The record contains ample evidence, including testimony of witnesses who were contemporaneously familiar with the transactions in question, supporting the arm's length nature thereof. The contract prices were arrived at by competitive bidding or by negotiation and there is nothing to show that they were not fair and reasonable. No attempt was made to negotiate for lower prices when payment was made entirely in cash. In some instances, prices were established before the supplier was asked to take part payment in preferred stock, and the prices were in no way altered when the supplier agreed. And defendant does not, as stated, dispute the predecessor's actual receipt of supplies and services worth $90 for each share of preferred stock issued to the contractors and suppliers. Defendant introduced no testimony at all on this aspect of the case and there is nothing of any substance in the record to support its suggestions and speculative intimations [50] to the effect that the bargaining was not in fact at arm's length.

Defendant seems to argue that the *Philadelphia Park* rule is, as it construes the case, applicable only in the situation of a taxable event to the acquiring party, *i. e.,* one in which it is necessary to establish the basis of property acquired in a transaction which in itself is a taxable exchange giving rise to gain or loss to the acquiring party. In the instant case, says defendant, the receipt of the materials and services was not a taxable exchange giving rise to gain or loss. Instead, defendant argues, it simply served to establish basis for the purpose of the depreciation allowance, which is designed to permit only recovery of the taxpayer's cost, *i. e.,* the value of the property he gave up, and not recovery of the value of the property he acquired, which, it is stressed, may well be entirely different.

Such an attempted limitation upon the *Philadelphia Park* holding is unwarranted. It is true that the court in *Philadelphia Park* determined that the exchange of the bridge for the 10-year extension of the franchise was a taxable exchange resulting in a gain or loss, the cost basis of which to the taxpayer would be the cost of the franchise extension. However, what was involved in *Philadelphia Park* was a determination of basis not only for gain or loss purposes, but also for purposes of depreciation. It was some years after the exchange, when the taxpayer abandoned its franchise, that it claimed a loss arising out of such abandonment in the amount of the undepreciated cost of the franchise at the time of the abandonment. This necessitated a finding concerning the original cost of the extended franchise as a basis for determining such loss. In addition, how-

50. " * * * it appears that those who agreed to take the preferred in the summer of 1929 were *probably* uninformed as to the true nature of the enterprise * * *." (Emphasis supplied.) (Def. Brief, p. 107)

ever, the taxpayer also claimed depreciation deductions for the amortization of such cost. Thus, the case involved a determination of the cost basis of the extended franchise and "the tax consequences" [51] thereof, not only for the purpose of establishing a capital-loss basis, but also, as in the instant case, for the purpose of establishing a proper depreciation basis, such factor, indeed, constituting a major consideration in the case. The court's reference in *Philadelphia Park* to the effect that the bridge-franchise exchange constituted a "taxable exchange" was made only in contradistinction to "the nonrecognition provisions of section 112(b) of the [1939] Code," [52] *i.e.*, the various situations in which, in the words of the statute, "no gain or loss shall be recognized." The taxpayer in that case had contended, *inter alia*, that the exchange was such a nontaxable transaction. However, once the transaction was classified as a taxable exchange, the basis determined for establishing gain or loss was also recognized as the basis for depreciation purposes.

But even in the sense in which defendant here uses the term "taxable exchange," *i.e.*, a transaction giving rise to income tax consequences in the form of a capital gain or loss, it is plain that the establishment of a basis for depreciation purposes also has, in the form of annual deductions from gross income, such consequences, as *Philadelphia Park* makes plain. For, as shown, the same original cost of the extended franchise which constituted the basis for determining the undepreciated cost the taxpayer would ultimately be entitled to write off at the time of the abandonment, also

determined the amount of the annual depreciation deductions that could be taken on such original cost in order to ascertain the amount of such undepreciated cost. Indeed, the determination of one basis for capital gain or loss purposes and another for depreciation purposes would, since they are both based on "cost," clearly produce an inconsistency which, it is plain, the Congress intended to avoid.[53]

Further, if defendant's attempted "taxable exchange" distinction of *Philadelphia Park* is, instead, based on the notion of immediate tax consequences, *i. e.*, the necessity of adopting some method, even rough, of determining basis so that a taxable transaction should not escape taxation, United States v. Davis, *supra*, compels its rejection. There, the stock marital rights exchange had immediate tax consequences to the husband, who disposed of the stock, but not to the wife, who received it. Yet the Court held that "the same calculation that determines the amount received by the husband fixes the amount given up by the wife, and this figure, *i. e.*, the market value of the property transferred by the husband, *will be taken by her as her tax basis for the property received."* (Emphasis supplied.) (*Id.* 370 U.S. at 73, 82 S.Ct. at 1195).

Defendant says that a current, retrospective, expert opinion of the then fair market value of the stock, based on the application of such factors as earnings and dividend prospects, book value, the capital structure of the corporation, and the state of the particular industry, as well as the general economy (the stock market crash occurred in late October

---

**51.** 126 F.Supp. at 187, 130 Ct.Cl. at 170.

**52.** 126 F.Supp. at 187, 130 Ct.Cl. at 171.

**53.** The Revenue Act of 1924 provided (section 204(b) and (c)) that the basis for depreciation should be the same as for gain or loss. This basis was cost. (Section 113(a) and (b), and section 114 (a) of the 1939 Code similarly so provided.) In commenting upon these 1924 Act provisions, H.R.Rep. No. 179, 68th Cong., 1st Sess. 18, 1939–1 (Part 2) Cum.Bull. 241, 254, stated:

" * * * It provides that the basis of computing depreciation and depletion shall be the same as the basis of computing gain or loss from the sale of property, and represents what is obviously the correct rule, since the theory in setting a basis for depreciation and depletion is the same as in setting one for determining gain or loss from sale; that is, to insure a taxpayer a return of his capital free from tax."

1929, in the midst of the construction program), shows that the contractors erred so greatly in 1929 and 1930 in accepting the stock at $90 per share that it must be concluded they had no real appreciation of what they were doing. It is evident, says defendant, that they must have been uninformed to have acted so rashly. Since the application of the fair market value test presupposes informed and knowledgeable contracting parties, Central Trust Company et al. v. United States, 305 F.2d 393, 402, 158 Ct. Cl. 504, 520 (1962), defendant argues that the $90 yardstick should, therefore, be rejected.

However, this contention in itself presupposes the propriety, in a case such as the instant one, of using expert testimony to test the rationality of the contemporaneous assignment by the contracting parties of a certain value to the stock. A wide discrepancy between an expert's retrospective valuation figure and the contracting parties' contemporaneous value judgment could then always be the basis for a contention that the party who accepted the higher valuation simply must be presumed to have been, at the least, uninformed. The use of the barter-equation method to establish fair market value being thus destroyed, it would then be necessary, since no other satisfactory objective method of determining such value would be available, to resort to expert opinion testimony. Thus the reasoning makes full circle. This approach must be rejected.

First, it is apparent that in any of the cases applying the presumed-equivalence-in-value rule, it could have been concluded that the value of the stock or other property involved should, instead, have been established, or at least tested, by expert testimony. However, since the use of such expert opinion testimony to establish valuation based on such factors as book value and earnings and dividend prospects is proper only when there is no better method of arriving at a reasonably accurate figure, it is plain that the use of the barter-equation rule was necessarily considered in such cases as constituting a better method. It is simply a matter of what is the best evidence in a particular case. As the Board of Tax Appeals stated in Amerex Holding Corporation, 37 B.T.A. 1169, 1190 (1938), affirmed per curiam, 117 F.2d 1009 (2d Cir.), cert. denied, 314 U.S. 620, 62 S.Ct. 64, 86 L. Ed. 499 (1941): "If therefore it appears from the record that the value of the property received, upon the issuance by a corporation of certain of its shares of stock, is the best evidence of the fair market value of those shares at the time of issue, that evidence should be applied and the fair market value of the shares of stock issued determined accordingly * * *." The Board therefore refused to accept an expert witness's opinion, given in response to hypothetical questions, as to the fair market value of stock.

This is not to say that, under any and all circumstances, and in accordance with a hard and fast rule, the value of shares issued for property must always be equated with the value of the property received in exchange. *Amerex Holding Corporation, supra,* at 1192.[54] But certainly a contemporaneous agreement between parties "with adverse interests" bargaining at arm's length "over the worth of property" as to "the dollar amount of that worth," *Seas Shipping, supra,* at 532, which is the situation in

54. " * * * a corporation is in a position to seek the best price obtainable [for its shares] and the price which a willing buyer, not required to buy, might reasonably be expected to pay would undoubtedly be determined with due regard to the assets, liabilities, earnings, records, and future business prospects of the corporation and to the price at which other shares of the corporation might be selling on the market, and if under such circumstances the directors exercised bad judgment in disposing of the stock, or, for some purpose in respect of which they might still exercise discretion, issued the shares for property having a value much lower than the price which could have been obtained, it could not reasonably be said that the cost of the property received, or in other words the fair market value of the stock issued, was limited to the value of the property received."

the instant case, is far superior to experts' widely varying judgments made many years later which are based on a host of factors that are concededly extremely difficult to evaluate. "What the value is [of stock exchanged for other property] in any case is to be determined by evidence, and a formula is only recognized at law as a makeweight or as a last resort." Pierce Oil Corporation, 32 B. T.A. 403, 430 (1935).[55]

Second, the record here shows that the experienced firms which participated in accepting the preferred stock at the $90 figure did not act blindly or recklessly. They were furnished projected sales figures and other financial information about the predecessor corporation and were, furthermore, informed of the others who were participants in the plan.

Although defendant now, over 35 years later, protests the alleged outlandish $90 valuation contemporaneously agreed to by the various contracting parties, the record shows that such valuation was upon responsible and considered review, accepted, also in more contemporary proceedings, by quasi-judicial as well as governmental authorities. When the predecessor and Oklahoma Contracting Company, which built a portion of the main line, had a dispute concerning the amount payable under the cost-plus part of their contract, the arbitration board to which the matter was submitted decided, on July 5, 1930, the amount due and, in addition, provided that the award was to be payable in the predecessor's preferred stock at a $90 per share value. This provision was one to which the contractor, feeling that the stock, based on a value of $90 per share, was equivalent in value to the amount of the award, had no objection. And in 1944 and 1945 the Federal Power Commission conducted a lengthy review of plaintiff's books and accounts to determine, for rate-making purposes, the original cost of the plant and property. No exception was taken to the $90 valuation upon which the cost was based.

■■■ The record thus containing nothing of substance to warrant the rejection here of the barter-equation or presumed-equivalence-in-value rule, no reason becomes apparent which would compel resort to expert opinion testimony, a method employed only when no other satisfactory method, based on contemporary events, is reasonably applicable. Accordingly, defendant's expert opinion evidence, as well as plaintiff's rebuttal evidence of a similar nature (offered only protectively since plaintiff relies on the barter-equation rule) has not been considered for the purpose of establishing other possible valuations as of the various dates the predecessor either obligated itself to the contractors and suppliers to issue the shares or as of the dates such shares were actually issued.[56]

As to the second issue involving the question of whether the 5,700 shares issued to Ford, Bacon & Davis in October 1929 were in payment of services performed (with the value of the shares, therefore, forming part of the depreciation base), or whether the transaction was simply a straight cash purchase by the Ford firm, it seems clear that the record simply does not permit the payment-for-services conclusion urged by defendant, which is based solely upon inferences drawn some 35 years later. The direct evidence is overwhelming the other way. The testimony by both parties to the stock transaction is that a purchase and sale was intended. All the contemporaneous records are cast in such form and support the testimony. There is no con-

---

**55.** In this case, the Board refused to value the shares by the value of the property received therefor since the record contained "substantial evidence as to the actual value of Pierce Oil shares" (at 430). The rule that "the value of the shares is measured by the property," it held, is to be applied only where "the value of the property received is the only available measure of the cost. Obviously it has no application where many shares were already outstanding representing other property and such shares have a determinable value." *Id.*

**56.** Nor have any findings, therefore, been made with respect thereto.

trary evidence. Nor is any tax advantage to either party offered as a reason why the parties should have indulged in the alleged window dressing. The Ford firm would receive the same amount of income whether paid in cash or stock and the basis for the securities would be the same whether acquired by purchase or as payment for a fee. Nor was there any apparent contemporaneous concern that the predecessor might take a different depreciation base if stock were used in payment.

The factor that seems to strongly arouse defendant's suspicion is that, as recorded on the books, the purchase price of the stock by the Ford firm was, in dollars, approximately equal to its fee under its May 1929 contract for designing and supervising the construction of the transmission system. At $87.50 per share (plus accrued dividends) the purchase amounted to $498,750. As stated, the fee was $500,000. This, says defendant, "had the effect of returning to the predecessor corporation all of the cash which was advanced to Ford, Bacon & Davis as fees in 1929." [57] As motive, defendant suggests that because the Ford firm also had a contract for the management of the system after it would go into operation, it had a stake in the predecessor's success and continued life. Since the predecessor was then engaged, as part of its effort to conserve cash, in a program of requesting contractors to take preferred stock in part payment of their services, "it was logical that Ford, Bacon & Davis should do likewise," [58] since "the predecessor corporation probably would not have been able to persuade others to take preferred in part payment for services and materials without representing that Ford, Bacon & Davis had agreed to do likewise." [59] It hardly seems likely, says defendant, that such a "sophisticated, well-known" firm would, in view of the stock market collapse, have invested $500,000 in the stock of such a new and "already-troubled enterprise" [i. e., its shortage of cash] "but for some compulsion or commitment and its affiliation with the enterprise." [60]

All these contentions are based on pure speculation. Furthermore, the alleged basic purpose of the transaction, i. e., the Ford firm's stake in the success of the enterprise, its desire, therefore, to participate in the cash conservation program, and its wanting to act in a manner which would induce the other contractors to emulate it, could be just as well accomplished by a straight purchase of stock as well as by an acceptance of stock for services, so that again no window dressing was necessary. Indeed, even assuming that, after the predecessor paid the Ford firm cash for its services and the firm then decided, for a variety of reasons, including those suggested by defendant, to invest the cash in the predecessor's stock, there would still be no reason to consider the transaction as a sham and thus in effect recast the contract between the parties so that it would be treated as one whereby payment would be made in stock rather than in cash. The evidence shows that it was not uncommon for the Ford firm to invest in the stock of its clients if it felt that it could do so on an advantageous basis. That the parties could have originally cast the contract in the form of taking stock for services furnished is quite immaterial. And as to the alleged unlikelihood of the Ford firm's purchasing the stock after the market crash in October 1929, the evidence shows that, although the actual issuance of the shares occurred after the collapse, the firm committed itself to purchase the stock during the summer of 1929.[61]

57. Def.Brief, pp. 96–97.

58. *Id.* at 97.

59. *Ibid.*

60. *Id.* at 98.

61. Furthermore, the market collapse in October 1929 did not mark the end of contemporaneous value judgments of $90 per share. When the predecessor and the Ford firm entered into a settlement agreement in May 1930 concerning the secondary line construction, the contract specifically called for the payment of the firm's fee in preferred stock at the rate of $90 per share. The arbitration award

For all of the above reasons, it is concluded that plaintiff has here carried its burden of showing that the Commissioner of Internal Revenue erred in treating the 5,700-share transaction in question as a payment of preferred stock for services (and therefore throwing the stock into plaintiff's depreciation base at his low valuation figures).

On this item plaintiff is entitled to recover in such amount as is produced by calculating the depreciation deductions for the years involved upon a base which includes 21,040 shares of preferred stock issued, as above described, to contractors and suppliers in part payment for materials and services, such stock to be valued at $90 per share, i.e., $1,893,600, instead of the number of shares and the valuations determined by the Commissioner.[62]

## ALABAMA GAS NOTE ISSUE

Included in the assets which plaintiff acquired from its predecessor was a note dated December 27, 1933, in the principal amount of $350,000, issued by the Alabama Natural Gas Corporation. As of December 31, 1935, when plaintiff acquired the note, interest in the amount of $42,291.67 had accrued thereon but had not been paid. However, plaintiff paid the predecessor only $350,000 for both the note and the accrued interest. (None of such unpaid interest had ever been included by the predecessor in income for federal tax purposes.)

All of this $42,291.67 in past due interest was, by 1941, paid by Alabama Gas to plaintiff ($10,000 in 1938; $9,000 in 1939; and $23,291.67 in 1940), such payments being in addition to the current interest payments due and paid on the note. Since plaintiff had, as a package, paid $350,000 for both the principal and the unpaid and accrued interest, it treated the past due interest payments as a return of capital and not as interest income. It accordingly adjusted its cost basis for the note downward by such amount.

In 1946, the full $350,000 principal amount of the note was paid by Alabama Gas.

With respect to plaintiff's tax liability for 1946, the Commissioner of Internal Revenue took the position that, since plaintiff had treated the past due interest payments as adjustments to basis, such basis consequently should be adjusted to $307,708.33 ($350,000 minus the past due interest of $42,291.67), and that plaintiff, therefore, had realized a gain of $42,291.67 when the note was paid in full by the $350,000 payment. He therefore added such gain to plaintiff's income.

During the trial proceedings herein, defendant reiterated the Commissioner's position. Plaintiff, however, contested it. Its contention was as follows: When plaintiff received the past due interest in 1938, 1939, and 1940, it was then on a cost basis with respect to said note and accrued interest, since, as hereinabove noted, the transaction by which it acquired all of the predecessor's assets was considered to be a taxable one. On such basis, it was proper for it to have considered the

to Oklahoma Contracting, also measured in terms of $90 per share, was similarly made after the market crash.

62. After 267 shares were issued to O'Brien Brothers, 13 of such shares were returned to the predecessor and presumably canceled. Defendant contends that the depreciation base should, accordingly, be appropriately adjusted downward to reflect such return and cancellation. The record does not presently indicate what appropriate depreciation base adjustments, if any, were made by the predecessor subsequent to the cancellation and return. If there was an overissuance, or if the return and cancellation otherwise constituted an adjustment based upon the predecessor's failure to receive materials or services represented by the 13 shares, the depreciation base should, of course, have been adjusted accordingly, in which case plaintiff's entitlement to recovery should be framed upon a calculation of 21,027 shares instead of 21,040. This matter can be ascertained in connection with the proceedings to be had under Rule 47(c) for the determination of the exact amount due.

defaulted interest as a return of capital to be charged to basis since, as a purchase, both the note and the defaulted interest were collectively purchased at the single cost of $350,000. However, when, as a result of the heretofore noted sections 112(b) (10) and 113(a) (22) of the 1939 Code (added thereto by section 121 of the Revenue Act of 1943, 58 Stat. 21, and which were applicable only to tax years beginning on and after January 1, 1943), pursuant to which plaintiff's acquisition of the predecessor's assets fell into the category of a nontaxable exchange, plaintiff's basis then changed from its cost to that basis which the property had in the predecessor's hands on the December 31, 1935 date of the acquisition of the property by plaintiff. The predecessor's basis for the note was $350,000. That was the amount it gave Alabama Gas when the note was executed in 1933. As of December 31, 1935, when plaintiff acquired the note, there had been no principal payments thereon, so basis of $350,000 carried over to plaintiff. On such basis, the defaulted interest payments which plaintiff subsequently received in 1938–1940 must, therefore, necessarily be regarded as interest and not as a return of capital, for that is how they would have been regarded asnd reported had the note remained in the predecessor's hands. Under the carryover basis theory, plaintiff is regarded as merely stepping into the shoes of the predecessor. Thus, when the principal of the note was repaid in 1946, there was only a return of capital originally laid out with, consequently, no gain resulting. While, as shown, plaintiff had in fact not treated such defaulted interest payments as a receipt of interest, so that it had not paid any tax thereon, section 121 of the Revenue Act of 1943, which put the carryover-basis rule into the Code for insolvency reorganizations (into which category plaintiff's acquisition of the predecessor's assets fell), provided for back-casting the rule, but

only for the purpose of determining future tax effects of past transactions and not of altering the tax results of the back years themselves. Therefore, in this particular situation, plaintiff is not, as to such $42,291.67 of defaulted interest, required to pay any tax thereon, either as for a capital gain or as for interest income.[63]

In its brief to the commissioner, defendant now concedes the correctness of plaintiff's position.

Accordingly, in accordance with the parties' present agreement as to the proper interpretation and effect of the statutes on a transaction such as the instant Alabama Gas note one (no reason appearing for not giving effect to the parties' agreement with respect thereto), plaintiff is entitled to recover on this issue in such amount as is produced by eliminating the sum of $42,291.67 as capital gain for the year 1946, said amount having been added to plaintiff's income for such year by the Commissioner of Internal Revenue.

### POOLING EXPENSES

This item is based upon certain expenditures plaintiff made during the years 1943–1947 with respect to oil and gas leases it had acquired. Plaintiff contends that these expenditures constitute "ordinary and necessary expenses * * * in carrying on [its] trade or business" under section 23 of the Internal Revenue Code of 1939 (26 U.S.C. § 23 (1952)), and are therefore deductible, in the computation of its income tax, from gross income during the particular years. Defendant contends that the expenditures are of a capital nature under section 24 (a) (2), *i.e.*, amounts paid out "for permanent improvements or betterments made to increase the value of any property or estate," and therefore to be capitalized. In the latter event, the expenditures would become part of a tax base and recoverable over a longer period of time through the depletion allowance.

---

**63.** Similarly, however, there might well have been other situations where cost-basis gains were taxed in the intervening period and where a carryover basis would have resulted in no gain. Plaintiff could not go back and recoup such taxes.

Plaintiff's deductions of the expenditures from gross income on its tax returns for the years 1943–1947, totaling $64,114.15, were disallowed by the Commissioner of Internal Revenue.

In 1942, plaintiff acquired certain oil and gas leases on relatively small adjoining tracts located in the Bear Creek Field in Louisiana. The expenditures herein involved were those subsequently incurred by plaintiff in obtaining so-called "pooling" agreements from all parties (surface owners, royalty owners, mineral rights owners, etc.) who held interests in such leases. Under each of the individual leases, plaintiff had the right (and obligation) to drill on the property covered thereby. However, where the properties adjoin, it is not desirable to place a well on each small parcel of land covered by an individual lease. For one thing, where the oil or gas in the pool beneath the several adjoining properties can feasibly be extracted by one well, it would obviously be uneconomic and inefficient to effect the extraction by numerous wells. For another, the operation of a well on one parcel opens up the door to claims by those having interests in the adjoining property that the minerals under their property were being wrongfully drained. To prevent such drainage, plaintiff would be obliged to drill an "offset" well on such adjoining property. In addition, the states have a conservation interest in the problem. The Department of Conservation of the State of Louisiana declared, in its Order No. 78, that one well was capable of draining "efficiently and economically" an area of approximately 640 acres.

Accordingly, it is common in the industry to "pool" a number of small parcels into a larger drilling unit, and, during 1943–1947, plaintiff obtained fourteen such pooling agreements on its Bear Creek leases, each agreement creating a 640-acre unit for one gas well.[64] It incurred expenses totaling $64,114.15 in obtaining such agreements, of which $41,246.96 was paid as consideration therefor, and it is the proper tax treatment thereof which is here in issue.

Prior to the pooling agreement, each owner of an interest in a tract covered by a lease had an interest only in the royalties and other benefits accruing from production from such tract. Under the pooling agreement, however, each such owner had an interest in the royalties and other benefits accruing from production from all the tracts in the 640-acre unit, such interest being a percentage obtained by dividing 640 into the acreage of the tract in which he originally had his interest. Thus, if a party to the pooling agreement was originally entitled to the royalties on ten acres, he was, after the agreement entitled to 10/640 of the royalties on the entire 640-acre tract.

While "[t]he line which separates capital expenditures from ordinary expenses cannot always be clearly drawn" (Connecticut Light and Power Company, supra, 368 F.2d at 240, 177 Ct.Cl. at 407), it seems clear that the expenditures made in forming the pooling agreements should be regarded as ordinary and necessary expenses incurred for the efficient operation of plaintiff's business. Plaintiff could hardly be said to have acquired any property rights of a capital nature as a result of the agreements. It had drilling rights on the properties involved before the agreements were entered into and it had the same rights subsequent thereto. Insofar as plaintiff was concerned, what the pooling agreements essentially accomplished was to relieve it of the obligation of drilling unnecessary wells. Cf Belridge Oil Co., 27 T.C. 1044 (1957),[65]

---

64. Furthermore, during the war years, steel allotments were made only for large wells.

65. "Our examination of the unitization agreement discloses no words of conveyance. * * * We think the unitization agreement here was nothing more than another joint effort on the part of the owners of the producing rights to the Zone to best conserve their respective individual interests therein by joining in a plan for the most economical and productive operation of the whole field. Hence,

affirmed, 267 F.2d 291 (9th Cir. 1959) ;[66] Earl V. Whitwell, 28 T.C. 372 (1957), reversed on other grounds, 257 F.2d 548 (5th Cir. 1958) ;[67] Winfield Killam, 39 T.C. 680 (1963),[68] all holding that unitization agreements by owners of producing rights did not effect a tax-free exchange of separate property interests for new property interests within the meaning of the income tax laws.

The only decision directly in point cited by the parties is Campbell v. Fields, 229 F.2d 197 (5th Cir. 1956), which sustains plaintiff's contention, holding that expenses incurred by lessees incident to forming pooling and unitization agreements were properly deductible in the year incurred as ordinary and necessary business expenses under section 23 of the Internal Revenue Code of 1939, the same section herein involved. In that case the government contended that the pooling agreement modified the leases by converting them into larger units, thereby increasing their value, and that, since the original leases held by the lessees represented capital investments,[69] the pooling agreement itself, effecting such value increase, should be treated as such an investment. The court, however, rejected the contention as giving "too much consideration to form and too little to substance" (at 201). After analyzing "the nature of the property right as was evidenced by the leases and the extent to which that right was changed by the pooling and unitization" (id.), the court concluded:

* * * Subsequent to the pooling and unitization each owner and lessee has the right to a share in the gas in the field to be produced through wells on the land included in the unit, each participant's portion being measured by the area of his contribution to the unit. His ultimate economic interest is little, if any, different after pooling and unitization than before.

It cannot be said as a matter of law, and we doubt that there could be any accurate determination as a matter of fact, whether the ultimate. realization by taxpayers would be greater or less with unitization than without well spacing and unitization. We do not find that the unitization of the leases resulted in any such conversion of the character of taxpayers' investment as worked a basic change in the nature of the property right which they held. * * * (at 201–202)

It therefore held that the expenditures made incident to forming the pooling agreement "were not made for acquiring

we think each participant had exactly the same interests and rights in its respective properties after unitization as before, except that by mutual consent they had agreed to limit their production and operate their wells in the most economically feasible way from the standpoint of conservation considerations." (at 1053–1054)

66. "This court is of the opinion that in income tax language there was no exchange. * * * Essentially the view we take of the unitization transaction is that it amounts to no more than an agreement as to how the parties will use that which they already had." (at 295)

67. Holding that in Louisiana, there was, in accordance with the decision of the Supreme Court of Louisiana in Martel v. A. Veeder, Inc., 199 La. 423, 6 So.2d 335 (1942), no exchange or cross-conveyance of properties in unitization.

68. " * * * The unitization agreement in *Whitwell* was by compulsory action under a State law whereas the agreement in the *Belridge* case was voluntary. We said this was immaterial on the question whether property or property rights were conveyed and that in either instance unitization amounts to no more than a production and marketing arrangement as between owners of oil-producing properties or rights. * * * We realize, of course, that the laws of the various States are not uniform in determining the legal effect of unitizing oil properties. * * * It is our opinion that the Federal tax effects of unitization should not be made to depend upon the geographical location of the unitized properties, but, as pointed out by the U. S. Supreme Court, the tax laws should be interpreted so as to give a uniform application to a nationwide scheme of taxation." (at 688–689)

69. Vern W. Bailey, 21 T.C. 678 (1954).

property or defending title to property, nor for the purpose of converting one kind of property into some different kind of property," and that they were, instead, "incurred in order that the taxpayers might realize and enjoy the income from the property" (at 203), a type of expense which, as distinguished from "additions to the capital investment in the property," the court had previously held in Bliss v. Commissioner of Internal Revenue, 57 F. 2d 984, 985 (5th Cir. 1932), constituted an ordinary and necessary business expense.[70]

Defendant's attempt to distinguish Campbell v. Fields on the ground that there, only attorneys' fees and surveying charges incident to the formation of the pooling agreements were involved, while here there are also included in the amounts expended sums paid as consideration for the pooling agreements, is hardly meaningful. There is nothing inherent in attorneys' fees or surveying charges which would prevent them too, in a proper situation, from being capitalized. Defendant makes no such contention here nor was any such contention made in *Campbell*.

Another alleged distinction is that the court in *Campbell* held as it did on the ground that the lessees "acquired no new rights and that there was no conversion of one kind of property into another," while in the instant case, plaintiff "did acquire a new right of continuing value—the right to drill but one well for each 640-acre unit and the right to develop the leases without unnecessary wells"

(Def. Brief, p. 133). Although defendant concedes "this may also have been true in the *Fields* case, the Fifth Circuit did not appear to take cognizance of this important factor * * *" (id.). In Campbell v. Fields the taxpayers entered into both pooling and unitization agreements, the expenses involved in the controversy apparently being applicable to both (a unitization agreement being one entered into between lessee-operators to effect "development and operation of an oil pool as a unit," designating "one or more of the parties as operator" (229 F. 2d at 199)). However, for the purpose of deciding the "ordinary" and "necessary" business expense issue involved, the court did not make any distinction between pooling agreements entered into between the owners of the royalty interests and the lessees, and unitization agreements entered into between the lessee-operators. "The Government concedes * * * that the restrictions with respect to the spacing of wells impose an economic burden on operating except under pooling agreements, and that economic advantages are made possible by unitization" (at 201), and the court went on, as above set forth, to reject the contention "that by the pooling and unitization there was a modification of the leases resulting in their conversion into unitized proration units calculated to increase their capital value" (*id.*). Thus, the contention that the court in Campbell v. Fields did not "take cognizance of [the] important factor" of a pooling agreement's effect of eliminating unnecessary well drilling, is not justified.

---

70. In *Bliss*, the court held that attorney's fees incurred to defend the taxpayer's oil and gas rights were not capital expenditures. It stated:

"* * * To treat as an addition to the cost of land the amount of an expenditure made, after ownership was acquired, to enable the owner, his agent or lessee, to possess and use the land for business purposes, undisturbed by intruders or trespassers, would involve a disregard of the difference between the cost of acquiring ownership of property and expenses paid or incurred to protect the owner's right to undisturbed possession and enjoyment of his property, and what it yields or produces, by himself, his agents or lessees. It seems reasonable to treat amounts expended for services rendered in ejecting or excluding trespassers after ownership had been acquired as expenses incident to the ownership of property and the acquisition and enjoyment of income from it, rather than as additions to the capital investment in the property. We conclude that the attorney's fees incurred and paid as above stated were ordinary and necessary business expenses * * *." (at 986)

This factor was not only considered—it was emphasized.

Finally, defendant urges that if Campbell v. Fields, is not to be distinguished it should not be followed. It says that the principles enunciated by this court in *Connecticut Light and Power Company, supra,* properly applied to the facts of the instant case, would lead to a result different from that arrived at in *Campbell.*

It is plain that the court in *Connecticut* did not intend to lay down an all-embracing and strict rule to the effect that every expenditure which produced something which could be said to be "of continuing value" to the taxpayer must automatically be classified as a capital outlay. Instead, the court, as its citation of and quotation from United States v. Akin, 248 F.2d 742 (10th Cir. 1957), makes plain (368 F.2d 233, 177 Ct.Cl. at 409), was only laying down some general guidelines to aid in the solution of the often difficult question of distinguishing between current and capital expenditures, and, quite properly, considered the "continuing value" aspect as one consideration.[71] It recognized, however, that the result depends upon the "unique factual pattern[s]" of the individual case (368 F.2d at 240, 177 Ct.Cl. at 407), emphasizing what the court stated in Russell Box Co. v. Commissioner of Internal Revenue, 208 F.2d 452, 454 (1st Cir. 1953):

> It has been said that the essential difference between an ordinary and necessary business expense and a capital expenditure is the difference between unkeep and investment, or between a maintenance or operating expense and a capital disbursement. * * * But such statements do not go far in solving concrete cases. * * *

As stated, in *Connecticut,* the flowage rights and easements the power company took by eminent domain constituted an inseparable part of the overall dam property. Without the acquisition of such rights and easements, the project could not have been constructed. The expenditures involved in obtaining them, therefore, were properly held to constitute an integral part of the dam, which itself was a capital asset depreciable over a period of years. In the instant case, however, the pooling agreement expenses, which essentially eliminated the necessity of drilling unnecessary wells, was, as Campbell v. Fields holds, in the nature of an "operating expense," rather than a capital disbursement. That such agreements may also have produced some benefits of continuing value (*i. e.,* the elimination of drainage claims), as would necessarily be true of many ordinary and necessary business expenses designed to produce more efficient operations, would nevertheless not, it seems plain, serve to make, for that reason alone, the expenses incurred in their procurement capital in nature.

The analogy of the instant case to the earlier Connecticut Light & Power Company v. United States case, 299 F.2d 259, 156 Ct.Cl. 304, (1962), would be more appropriate. There it was held that the utility's costs incurred in converting its customers' gas-consuming equipment for the use of natural gas were deductible as ordinary and necessary expenses and were not in the nature of capital outlays. And such expenditures, it should be noted, necessarily resulted in benefits to the company of continuing value, for the conversion would obviously produce a supply of natural gas over many years. The Court stated:

> * * * It is apparent that neither plaintiff nor its customers acquired any new assets as a result of the con-

---

[71]. In United States v. Akin, 248 F.2d at 744, reads as follows:

" * * * It is not always easy to find a verbal formula which readily supplies an unerring guide in drawing the boundary line between current expenses and capital outlays. But it may be said in general terms that an expenditure should be treated as one in the nature of a capital outlay if it brings about the acquisition of an asset having a period of useful life in excess of one year or if it secures a like advantage to the taxpayer which has a life of more than one year. * * * "

version expenditures. It appears to us, rather, that their net effect was to enable plaintiff to retain precisely the same privilege of supplying gas to its customers, for as long as they desired, as it had previously. (299 F.2d at 265, 156 Ct.Cl. at 312–13)

Similarly, as Campbell v. Fields holds, the costs herein involved, although incurred to enable the more efficient production of gas, result in the obtaining of such production from the same interests as plaintiff previously had.

Based on the above considerations, no persuasive reason for departing from the Fifth Circuit's holding in Campbell v. Fields has been advanced.

For the same reasons, the expenditures in question would not fall, as defendant urges, within the provisions of Section 29.23(m)–10(a) of Treasury Regulations 111, which provides in part: "In the case of the payor any payment made for the acquisition of an economic interest in a mineral deposit * * * constitutes a capital investment in the property recoverable only through the depletion allowance." As pointed out, plaintiff had already obtained its economic interests in the gas deposits through its original leases. The pooling agreements did not, for income tax purposes, give it such new interests therein as to make the expenses incident thereto capital outlays.[72]

█ For all of the above reasons, the expenditures involved in this item should be treated as ordinary and necessary expenses deductible, in the years incurred, from gross income under section 23 of the 1939 Code. Plaintiff is, therefore, entitled to recover on this item in such amount as is produced by allowing, on its 1943–1947 income tax returns, as deductions from gross income under section 23 of the 1939 Code, its expenditures incurred in obtaining the pooling agreements with respect to its oil and gas leases in the Bear Creek Field in Louisiana.

## CAPITALIZATION OF DEPRECIATION

During the 1941–1953 years herein involved, plaintiff, by the construction of additional facilities, expanded its pipeline system. Plaintiff owned, during the years 1946–1953, certain automotive equipment (including a boat in 1953) which it used for purposes primarily relating to the operation and maintenance of the system. From time to time, however, such equipment was engaged on the construction operations.

The equipment in question was depreciated at the rate of 4 percent annually (under plaintiff's composite account method of depreciation). On its books, plaintiff capitalized that portion of the depreciation which was attributable to the time the equipment was used in connection with the construction projects, i.e., such portion of the depreciation amount was treated as part of the cost of the projects constructed. However, on its income tax returns for such years, plaintiff claimed the full amount of the depreciation as current deductions without any allocation, for capitalization purposes, to any construction activity. Upon final audit, the Commissioner of Internal Revenue, concluding that the manner in which plaintiff had treated the depreciation on its books was proper, required the capitalization of that part of the

---

72. Nor, clearly, could the expenditures be considered, as defendant contends, as such a "lease development" cost as the geophysical survey (made on all the properties upon which the lessee held mineral leases) which the Tax Court in Louisiana Land & Exploration Co., 7 T.C. 507 (1946), aff'd as to other issues, 161 F.2d 842 (5th Cir. 1947), held constituted an "over-all geophysical exploration" (at 516), the costs of which should be capitalized. The survey was made "to guide petitioner in determining generally whether and to what extent these large areas of land should be explored by drilling wells" (at 515). The court considered the survey cost to constitute the same type of development expense as "platting, mapping, and subdividing of a tract of land held for sale * * *" (at 516). Pooling expenses are hardly of such a nature.

depreciation which was allocable to the time the equipment had been devoted to project construction purposes. Such portions of the depreciation deductions were therefore transferred to the cost bases of the projects, to be depreciated, together with the rest of the projects' costs, over the lives of the projects. It is this capitalization of such portion of the depreciation which is here in dispute. Thus, there is no question of plaintiff's being wholly deprived of any depreciation deduction. It is simply a matter of whether the part of the depreciation involved will be recouped in the one year in question or over a period of years.

The amount of the depreciation properly allocable to the costs of the projects involved, if such an allocation is required as a matter of law, is not in dispute.

■ On this issue it seems clear that the Commissioner's action was correct. All costs which enter into the creation of an asset and give it value should be included in the asset's depreciable base, to be recovered over the life of the asset. If a salaried employee spends part of his time on a corporate project under construction, and part on regular corporate pursuits (assuming the corporation is not in the construction business), that part of his salary represented by the time he spent contributing to the advancement of the project should be allocated to the cost of the project and depreciated over the life of the asset, together with all the other project costs (which, as shown, is plaintiff's practice when it capitalizes the salaries of its employees (landmen) attributable to the acquisition of pipeline right-of-way agreements). Similarly, if an item of depreciable equipment, such as an automobile, is used on a part-time basis on such a project, the part of the depreciation represented by the time the equipment was devoted to construction purposes should be allocated to the project costs. The depreciation of the equipment here in question was certainly a

cost to the plaintiff. No reason is apparent for carving out a special exception for depreciation. The contribution of a part of such cost to the asset being constructed necessarily gave an equivalent added value to the asset. It must, therefore, be included in the project's base costs, i. e., capitalized. As noted, plaintiff recognized these principles by keeping its books in that manner, thus obtaining an accurate calculation of the project's complete costs. Under the theory it urges in this case, however, there is no explanation of how the part of the depreciation expense which contributed to the value of a project is recouped if the project is sold.

Under plaintiff's theory, it would, indeed, appear that plaintiff would, because of the inaccurate basis resulting from the omission of such a project cost, recover the depreciation cost in question twice, once through the deduction it wishes to take as a current expense, and again when the construction project is sold or its investment otherwise fully recouped at the end of its depreciation period. If sold, the price would, presumably, fully reflect the added value contributed by the use of equipment in the construction of the asset, and the salvage value will necessarily be that much greater if fully depreciated on the lower cost basis.

Section 24(a) (2) of the 1939 Code specifically provides that: "In computing net income no deduction shall in any case be allowed in respect of * * * [a]ny amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property * * *." Similarly, the regulations issued thereunder require the capitalization of "amounts paid for increasing the capital value * * * of property."[73] These Code and regulation provisions clearly sustain defendant's position.

Plaintiff bases its claimed right to deduct in the particular years involved the

73. Section 29.24–2 of Treasury Regulations 111, applicable to the years 1946–1951, and section 39.24(a)–2 of Regulations 118, applicable to the years 1952 and 1953.

**1266**

entire 4 percent depreciation on the equipment in question—without any diminution resulting from allocating any part thereof for inclusion in the cost of the projects constructed during such years—upon section 23(*l*) of the 1939 Code. That section allows, in the computation of net income, a deduction from gross income for depreciation on "property used in the trade or business or * * * held for the production of income." [74] Plaintiff says that it was its "business" to expand, and that the newly constructed facilities constituted "property held for the production of income." The devotion of its equipment to such construction activities, it argues, thus constituted a use in its "trade or business," entitling it to the stautory depreciation deduction in full in the pertinent year.

██ Of course, the term "business" could, in a certain sense, be so used, *i.e.*, plaintiff's purpose was to expand, or plaintiff made it its "business," or goal, to expand. Indeed, practically all businesses have such a purpose or goal. But that, clearly, is neither the ordinary meaning of the term nor the sense in which the section of the Code relied upon uses it. Such an interpretation would make it practically impossible for any businessman to use a realistic cost basis on a building or other project being constructed for ultimate use in his business and in connection with the construction of which any of his own personnel or equipment was used. Pushed to its logical conclusion, it would, indeed, mean that a businessman who constructed, with his own men, materials, and equipment, a new physical asset for use in his own business would deduct from current expenses all the costs of the creation of the asset, leaving it without any cost base for depreciation or other purposes. And, as stated, the theory would directly contravene section 24(a) (2) forbidding deductions in respect of expenditures made in connection with "new buildings" or "permanent improvements or betterments made to increase the value of any property." All the sections of the Code must be read together to avoid conflict and achieve a harmonious, rational result. Certainly, plaintiff's "business" was the operation of a natural gas pipeline system, and not the construction of capital assets.

Great Northern Ry. Co. v. Comm'r of Internal Revenue, 40 F.2d 372 (8th Cir.), cert. denied, 282 U.S. 855, 51 S.Ct. 31, 75 L.Ed. 757 (1930), upholds the Commissioner's position herein. In that case the court affirmed the Board of Tax Appeals' approval [75] of the Commissioner's capitalizing for income tax purposes the amounts the taxpayer-railroad had capitalized on its books as the cost of transporting men and materials used in connection with betterments and additions. The transportation was effected by trains specifically devoted to the purpose, as well as by the taxpayer's regular passenger and freight trains. On the former, the entire cost of the movement was involved and easily ascertainable. As to the latter, a cost allocation was made in accordance with an Interstate Commerce Commission accounting formula devised for the charging by railroads to the cost of construction an allowance representing the expense to the railroad of transporting men and materials over their own lines for construction purposes. The court noted that "[n]either this labor nor material has anything to do with repairs, replacements, and maintenance. The labor and material involved here are entirely devoted to additions and betterments." (at 372) And it held:

It is obvious that this expenditure was a capital account and in no wise chargeable to operating expenses. Therefore, whatever its amount, it should not be used in reduction of net income. (at 373) [76]

74. See n. 4.

75. Great Northern Railway Co., 8 B.T.A. 225, 260–63 (1927).

76. The Board held, in discussing the amount to be allocated to construction costs: "In our opinion, a part of the wear and tear of the train equipment of

The rule was thereafter reaffirmed in Gulf, Mobile & Northern R. R. Co., 22 B.T.A. 233, 245–247 (1931),[77] and in Missouri Pacific R. R. Co., 22 B.T.A. 267, 286–287 (1931). And while Northern Pac. Ry. Co. v. Helvering, 83 F.2d 508 (8th Cir. 1936), involved only the question of the proper amount of the cost of transporting men and material for construction purposes which was to be allocated for capitalization, the court, in noting that "[t]here is no dispute that for income tax purposes these transportation expenses for construction should be deducted from the total maintenance and operating expenses * * " (at 509), further stated in a supporting footnote: "There could be no real dispute, as the expenses of such transportation are clearly a capital item. [citing cases]" (*Id.*) The allocation formula approved included "wear and tear [*i. e.*, depreciation] of the train equipment, of the rails, ties and roadbed * * *." (at 513)

Plaintiff relies on Great Northern Ry. Co., 30 B.T.A. 691 (1934), which held that the full amount of depreciation on the taxpayer-railroad's equipment sustained during the tax year, including depreciation during the period the equipment was used for the construction of additions to or betterments of the railroad's property, could be deducted, as an operating expense, from gross income, without charging any amount thereof to capital account (as the taxpayer had in fact charged on its books).

In light of its prior consistent holdings to the contrary, as well as the above-mentioned opinions of the Eighth Circuit, it is difficult to understand the decision. The only previous authority mentioned in the opinion is its own in Great Northern Ry. Co., 8 B.T.A. 225 (1927), which the Board noted was relied upon by the Commissioner of Internal Revenue in determining the deficiency but was not even mentioned in his brief submitted to the Board. The Board concluded that the Commissioner's failure to even cite the case meant that "apparently he no longer regards it as authority for the ruling now under review." (30 B.T.A. at 708) Perhaps the Board was influenced by what it construed to be a reversal of the Commissioner's position. In any event, the Board did say, as plaintiff points out: "In our opinion the equipment employed by the petitioner in its construction work was used by its owner in a trade or business. This satisfies the conditions of the statute." (Id.)

This explanation based on the acceptance of the taxpayer's meeting the "trade or business" provisions is overly simple. Of course equipment used in constructing additional facilities of the permanent improvement type is used in "a" trade or business, as the Board stated. It was certainly not used for pleasure. However, it is not used in "the" trade or business of the taxpayer, which is, as shown above, the word used in section 23(*l*). Further, it ignores the distinction the Court of Appeals drew in *Great Northern Ry. Co., supra,* between "repairs, replacements, and maintenance," which the court obviously concluded fell within the category of use in a railroad's "trade or business," as distinguished from use "devoted to additions and betterments." As

the rails, ties, etc., may be properly capitalized when men and materials for construction work are transported in transportation service trains." (Great Northern Railway Co., *supra*, n. 75, at 263). The following year the Board, in Chicago, R. I. & P. Ry. Co., 13 B.T.A. 988, 1021–1022 (1928) (Issue 2), reversed as to other issues, 47 F.2d 990 (7th Cir.), cert. denied, 284 U.S. 618, 52 S.Ct. 7, 76 L.Ed. 527 (1931), reaffirmed its *Great Northern* decision, holding that: "Respondent did not err in crediting operating expenses for the

years 1916 and 1917 the amounts representing expenses of transportation for investment." (at 1022)

77. " * * * the cost of transporting men engaged in and materials to be used for new construction constituted a capital expenditure and not a proper deduction in computing taxable net income." (at 245–46) The case was affirmed as to other issues, 63 App.D.C. 244, 71 F.2d 953. cert. denied, 293 U.S. 295, 55 S.Ct. 161, 79 L.Ed. 372 (1934).

above pointed out, if the Board's "trade or business" concept, as reflected in this case, were generally applied, any businessman could devote any of the equipment normally used in his ordinary business pursuits to the construction of new facilities without any costs of such use allocation ever being reflected in the cost base of the new facility for either capital gain or depreciation purposes.

Insofar as the Board may have been influenced by what it felt was an abandonment by the Commissioner of the position he had previously taken in the earlier *Great Northern* case, defendant's strong reliance here on such position, as affirmed by the Eighth Circuit, at least removes this factor from consideration.[78] The position was in fact reaffirmed prior to this case. *See* Rev.Rul. 55–252, 1955–1 Cum.Bull. 319 (timber planting costs, including depreciation of equipment, such as trucks, used in planting, should be capitalized and recovered through depletion as the timber subsequently is cut and sold). *See also* Rev.Rul. 59–380, 1959–2 Cum.Bull. 87 (depreciation sustained on construction equipment owned by taxpayer and used in the erection of capital improvements for the equipment owner's use should be capitalized and made a part of the cost of the capital improvement, such equipment *not* being considered as property used in the taxpayer's "regular trade or business" [at 88]).

Because of the above considerations, the Board's inconsistent holding on this particular issue in the second *Great Northern* case cannot be accorded the controlling weight which plaintiff urges it should have.[79]

■ The rejection of this item of plaintiff's claim means that from 1946 through 1953, the annual depreciation (at the 4 percent rate) on plaintiff's automotive equipment (including the boat) should, for the period or periods it was used in connection with the construction of new physical facilities and betterments constituting permanent improvements, be capitalized and added to the cost of such new facilities, with such capitalized amount to be depreciated, together with all the costs entering into the depreciation base of such facilities, at the 4 percent rate.

The facts show that, while the Commissioner did, in rejecting plaintiff's claim, and, in accordance with his theory, conclude that plaintiff was entitled only to an allowance of depreciation at the 4 percent rate on the capitalized amounts, he nevertheless, in computing such amounts, allowed the 1946 and 1947 depreciation only for those years. Although depreciation was allowed for 1948

78. Defendant's brief refers to the "Board's mistaken view that the Commissioner's unexplained failure to cite the first *Great Northern* decision meant that he repudiated its authority." (at 149)

79. Estate of Sam E. Broadhead, 25 T.C.M. 133 (1966), also cited by plaintiff, actually did not address itself to the issue herein involved, although it is true that the court did refer to the second *Great Northern* case in a manner that might be construed to constitute a reaffirmation thereof, the court referring to the fact that the respondent (Commissioner of Internal Revenue) "neither in his brief herein nor in Revenue Ruling 59–380, *supra*, discusses our holding in that case that depreciation on equipment employed by a taxpayer in constructing facilities as a part of its regular operations was deductible * * *." [at 154] (Assuming it would make any difference,

it does not appear that the Board in the second *Great Northern* case actually made any finding that the taxpayer-railroad constructed additional capital facilities "as a part of its regular operations.") Without considering the validity of Rev.Rul. 59–380, however, the taxpayer's claim that he was entitled to deduct the depreciation on certain equipment instead of capitalizing it and adding it to the cost basis of the timberlands involved, was denied in *Broadhead* simply on a failure of proof basis. Plaintiff had used draglines to improve the timberlands (construction of canals and roadways). Its attempt to deduct the depreciation on the draglines as a current expense of doing business was denied on the ground that it was not shown that, at the time in question, the particular lands involved were being used as a part of the operation of any going timber trade or business.

through 1953 on the capitalized depreciation incurred during those years, for some reason, possibly an inadvertent computational error, he failed to allow any depreciation for the years 1948–1953 on the depreciation capitalized for 1946 and 1947, i.e., he failed to carry the allowable amounts through to the subsequent years. For these years, plaintiff is, of course, also entitled to such allowances, as defendant concedes. (Def. Brief at 139, n. 46) Plaintiff is, therefore, entitled to recover on this item such amount as, for the years 1948–1953, is produced by allowing depreciation during those years at the 4 percent rate on the 1946–1947 capitalized amounts.

### LOSS ON SALE OF COMPRESSOR

In 1950, plaintiff purchased a Clark 600-horsepower compressor for $33,110.-18 for use in its ordinary business operations. Deductions for depreciation were taken thereon from the date of purchase.

Mississippi Gas Company was a wholly owned subsidiary of the plaintiff. During 1951, it required a compressor engine for use in its operations. At that time, plaintiff was not using the Clark compressor so it was lent to this subsidiary. The arrangement was that plaintiff would sell the compressor to the subsidiary after a fair price could be determined, such price to be in part dependent upon the amount the subsidiary would have to spend to recondition it.

In early August 1952, it was agreed that the then value of the compressor as reconditioned was $40,757.20, that $20,-757.20 was the cost of reconditioning, and that plaintiff's sale price to the subsidiary should, therefore, be the remaining $20,000. Thereupon, on August 18, 1952, the sale was effected at that price.

Plaintiff's depreciation on the compressor prior to its sale was $4,681.44.

As a result, plaintiff suffered a loss of $8,428.74, being the difference between the purchase price of $33,110.18 less the depreciation, and the agreed selling price of $20,000.

On its 1952 tax return, plaintiff claimed such $8,428.74 loss as an ordinary loss under section 117(j) (2) of the 1939 Code. This section provides that losses on sales of "property used in the trade or business," as defined in section 117(j) (1),[80] should, to the extent they exceed gains on such property, "not be considered as * * * losses from sales or exchanges of capital assets," i.e., they are to be treated as ordinary losses incurred in the regular course of business. The Commissioner of Internal Revenue, however, disallowed this deduction in full, thus refusing to accord the loss that ordinary loss treatment provided under section 117(j) (2).

In its petition herein and throughout the trial proceedings plaintiff contested the disallowance, contending that the loss it incurred on the sale of this machine qualified in all respects for ordinary loss treatment under section 117(j) (2).

In its brief to the commissioner, defendant now states that it concedes this issue. (at 152)

The parties now being in agreement that, under the facts as now established, the loss on the sale of the compressor is entitled to be treated as an ordinary one, and no reason being apparent for not accepting such agreement, plaintiff is, accordingly, entitled to recover on this issue in such amount as is produced by allowing, on its 1952 tax return, a deduction in the amount of $8,428.74 as for an ordinary loss arising from the sale of the Clark compressor.

This is the final issue that plaintiff has presented to the court for adjudication.[81]

---

80. I. e., the property (a) must have been used in the business; (b) was subject to a depreciation allowance; (c) was held for more than six months; (d) was not of a kind properly includable in inventory; and (e) was not held primarily for sale to customers in the ordinary course of business.

81. The petition sets forth certain other claims which, since plaintiff has not pursued them, are deemed to be abandoned.